**BARG SINGER HOESLY PC**
Cody Hoesly, OSB #052860
choesly@bargsinger.com
121 SW Morrison Street, Suite 600
Portland, OR 97204
Telephone: (503) 241-8521

**BURSOR & FISHER, P.A.**
Sarah N. Westcot (*pro hac vice* forthcoming)
Stephen A. Beck (*pro hac vice* pending)
701 Brickell Ave., Suite 2100
Miami, FL 33131
Tel: (305) 330-5512
Fax: (305) 676-9006
E-Mail: swestcot@bursor.com
sbeck@bursor.com

*Attorneys for Plaintiff and the Putative Class*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| B.N., individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Oregon Reproductive Medicine, LLC d/b/a ORM Fertility,<br><br>Defendant. | Case No. 3:25-cv-00202-IM<br><br>**PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY** |

**PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY**

Plaintiff B.N. ("Plaintiff") respectfully submits this Notice of Supplemental Authority regarding Defendant Oregon Reproductive Medicine, LLC d/b/a ORM Fertility's ("Defendant") pending Motion to Dismiss. *See* ECF Nos. 11, 14, 15. Plaintiff brings to this Court's attention

a recent denial of a motion to dismiss by the Honorable Martha M. Pacold in *A.M., et al. v. Advanced Reproductive Health Center, Ltd.*, Case No. 1:24-cv-07559, ECF No. 42 (N.D. Ill. Aug. 8, 2025). A copy of the motion to dismiss hearing transcript is attached hereto as **Exhibit 1**.[1] The *A.M.* matter concerned substantially similar allegations as Plaintiff's claims here.

The facts in the present matter closely mirror those of *A.M.*, which also involved a fertility clinic's disclosure of personal information to a third party on its public-facing website. In *A.M.*, the Court denied the defendant's motion to dismiss the plaintiff's claims for violation of the Electronic Communications Privacy Act, negligence, and unjust enrichment. Plaintiff respectfully suggests the Court should adopt the analysis of *A.M., et al. v. Advanced Reproductive Health Center, Ltd*.

Dated: September 23, 2025

**BARG SINGER HOESLY PC**

By: *__/s/ Cody Hoesly__*
Cody Hoesly

**BARG SINGER HOESLY PC**
Cody Hoesly, OSB #052860
choesly@bargsinger.com
121 SW Morrison Street, Suite 600
Portland, OR 97204
Telephone: (503) 241-8521

**BURSOR & FISHER, P.A.**
Sarah N. Westcot (*pro hac vice* forthcoming)
Stephen A. Beck (*pro hac vice* pending)
701 Brickell Avenue, Suite 2100
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: swestcot@bursor.com
sbeck@bursor.com

*Attorneys for Plaintiff*

[1] The *A.M.* court did not issue a written order.

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| A.M. and J.K.,on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ADVANCED REPRODUCTIVE HEALTH CENTER, LTD., doing business as Chicago IVF,<br><br>Defendant. | ) | Case No. 24 C 7559<br><br><br><br><br><br>Chicago, Illinois<br>August 8, 2025<br>9:15 a.m. |

TRANSCRIPT OF PROCEEDINGS - TELEPHONIC RULING
BEFORE THE HONORABLE MARTHA M. PACOLD

APPEARANCES:

For the Plaintiffs: BURSOR & FISHER P.A.
BY: MR. STEPHEN A. BECK
701 Brickell Avenue, Suite 2100
Miami, Florida 33131

For the Defendants: WOOD SMITH HENNING & BERMAN, LLP
BY: MR. JONATHAN J. IBARRA
222 S. Riverside Plaza, Suite 640
Chicago, Illinois 60606

Court Reporter: KATHLEEN M. FENNELL, CSR, RMR, FCRR
Official Court Reporter
219 South Dearborn Street, Room 2328A
Chicago, Illinois 60604
Telephone: (312) 435-5569
Kathleen_Fennell@ilnd.uscourts.gov

* * * * *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard via telephone:)

(Call to order.)

THE CLERK: 24 C 7559, M. v. Advanced Reproductive Health Center. If you can state your names for the record, we'll start with plaintiffs' counsel.

MR. BECK: Good morning. Stephen Beck from Bursor & Fisher on behalf of the plaintiff.

MR. IBARRA: Good morning, Your Honor. Jonathan Ibarra of Wood, Smith, Henning & Berman on behalf of defendant.

THE COURT: Good morning. We're here for a ruling on defendant's motion to dismiss the complaint or in the alternative motion to strike class allegations. That motion is Docket 28.

I'm prepared to proceed to the ruling. Is there anything that the parties would like to say before I actually turn to the ruling, any sort of status update, anything along those lines?

MR. BECK: Stephen Beck on behalf of the plaintiff, Your Honor. Nothing from us.

MR. IBARRA: Jonathon Ibarra on behalf of defendant. Nothing from us, Your Honor.

THE COURT: Okay. Thanks to you both, and so I will proceed to the ruling.

Just to be clear on the format, I will be ruling from the bench today, meaning that I'll be giving all my reasoning

on the record during the hearing.

I do not intend to issue a separate written ruling with the reasoning. I will follow up with a minute entry that gives the bottom line, but if you need the reasoning, it will be available on the transcript.

The reason I'm proceeding that way by a bench ruling instead of written order or opinion is just it's more efficient that way. The motion to dismiss was filed in February, and so we're now in August. And so given the age of the motion and also the fact that this is a 2024 case, it was filed last August, so coming up on a year ago and we're at the pleading stage, it makes sense to resolve this motion reasonably quickly, and I can do that faster in this format. I also think the issues are susceptible to addressing in this format.

For that reason, though, because I'm going to be walking through all of my reasoning on the record, it will take me some time to do that, and I thank everybody in advance for your patience as I go through the reasoning.

With that, let me turn to the ruling. And, again, the motion at issue is defendant Advanced Reproductive Health Center, Ltd.'s motion to dismiss for lack of subject matter jurisdiction and failure to state a claim and to strike class allegations. That's Docket 28. And for the reasons I will explain, I am going to deny the motion.

Beginning with the background. The parties are

familiar with the allegations in the amended complaint, which is at Docket 27, so I will provide only a very brief summary.

Defendant Advanced Reproductive Health Center, Ltd., also known as Chicago IVF, provides services such as artificial insemination, invitro fertilization, and genetic testing. Docket 27, paragraph 4. It also runs a website that it uses to advertise its services and communicate with clients. *Id.,* paragraph 6.

On that website, it installed several tracking technologies, including the Meta Pixel. The Meta Pixel is the primary focus of the complaint. *Id.,* paragraph 8; *see id.* at page 4, footnote 10. Through these technologies, third parties, such as Meta and Google, receive access to communications that clients send to defendant via its website. *Id.,* paragraph 10.

Among the pieces of information transmitted to Meta, for example, are clients' communications with defendant through the website, including their request to schedule appointments, *Id.,* paragraph 96, which are accompanied by Facebook IDs, which are "linked to" individual Facebook profiles and "uniquely indentif[y] an individual's Facebook account." *Id.,* paragraph 88.

Plaintiffs A.M. and J.K., two of defendants' clients, filed this putative class action alleging violations of the Electronic Communications Privacy Act (which is better known as

the Wiretap Act), negligence, unjust enrichment, and violations of the Illinois Eavesdropping Statute. The complaint is Docket 27. Defendant moved to dismiss under Rule 12(b)(1) for lack of standing and Rule 12(b)(6) for failure to state a claim, as well as to strike the class allegations under Rule 23. Docket 28.

Turning to the discussion, and I'll begin with the issue of standing.

First, defendant argues that the complaint should be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction. Specifically, defendant argues that plaintiffs lack Article III standing. "Standing has three components: Injury, causation, and redressability." *1000 Friends of Wisconsin, Inc. v. U.S. Department of Transportation*, 860 F.3d 480, 483 (7th Cir. 2017).

In other words, "if the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *Casillas, Madison Avenue Associates, Inc.*, 926 F.3d 329, 333 (7th Cir. 2019).

Defendant argues only that plaintiffs have not adequately alleged causation (sometimes known as traceability). However, courts "have an independent obligation to determine whether subject matter jurisdiction exists, even in the absence of challenge from any party." *Arbaugh v. Y&H Corporation*, 546

U.S. 500, 514 (2006), so I will also address the other elements.

Because defendant raises only a facial challenge to standing, that is, it "argues that the plaintiff has not sufficiently *alleged* a basis of subject matter jurisdiction," I must "accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015).

And there's an emphasis or italics in that quotation on the word "alleged" that's in the original, and I'm also omitting quotations.

I'll begin with the injury-in-fact requirement, "which the Supreme Court has described as the 'first and foremost' element of standing." *Casillas*, 926 F.3d at 333. In their brief in opposition, plaintiffs point to two alleged injuries: first, invasions of their right to privacy via the disclosure of their private information; and, second, failure to compensate them for the value of their private information. Because I conclude that the first injury, disclosure of private information, is sufficient to confer standing, I will not address the second injury.

"An injury-in-fact must be [1] concrete, [2] particularized, and [3] actual or imminent." *Ewing v. Med-1 Solutions, LLC*, 24 F.4th 1146, 1151 (7th Cir. 2022).

Beginning with concrete. An injury is "concrete" if

it is "real and not abstract." *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 381 (2024). Concrete injuries can be either "tangible harms, like physical and monetary harms" or, as here, "intangible harms, such as reputational harms, disclosure of private information, and intrusion upon seclusion." *Wood v. Security Credit Services*, 126 F.4th 1303, 1309 (7th Cir. 2025). To determine whether an intangible harm was "concrete" courts "look to both history and Congress's judgment." *Gadelhak v. AT&T Services, Inc.*, 950 F.3d 458, 462 (7th Cir. 2020).

Beginning with the history, the Supreme Court has "indicated that courts should assess whether the alleged injury to the plaintiff has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). "In looking to whether a plaintiff's asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts," courts "do not require an exact duplicate." *Id.* at 443. Courts "are meant to look for a 'close relationship' in kind, not degree." *Gadelhak*, 950 F.3d at 462.

In other words, "the question is whether the harm plaintiff suffered is" -- let me start that sentence over.

In other words, the question is whether the harm plaintiff suffered is "the same *kind* of harm that common law

courts recognize." *Id.* at 463.

In their brief in opposition, plaintiffs note that their injury stems from the invasion of their right to privacy. Docket 32 at 8. As the Seventh Circuit has explained, however, "at common law an invasion of the right to privacy has traditionally encompassed four distinct torts." *Nabozny v. Optio Solutions, LLC*, 84 F.4th 731, 735 (7th Cir. 2023). Two of the traditional privacy torts -- disclosure of private information (sometimes called giving publicity to another's private life) and intrusion upon seclusion -- are relevant here.

Addressing first disclosure of private information.

First I conclude -- as have several other courts in similar cases -- that the harm plaintiffs allege bears a "close relationship" to the common law tort of disclosure of private information. *See, e.g., Smith v. Loyola University Medical Center*, 2024 WL 3338941, at *4 (N.D. Ill. July 9, 2024); *Doe v. Genesis Health System*, 2024 WL 3890164, at *6 (C.D. Ill. August 21, 2024); and *see also Florence v. Order Express, Inc.*, 674 F. Supp. 3d 472, 480 (N.D. Ill. 2023)(finding disclosure of private information analogous in a case involving disclosure of other types of sensitive information); *Salazar v. National Basketball Association,* 118 F.4th 533, 540-44 (2d Cir. 2024)(same).

In *TransUnion*, the Supreme Court acknowledged that

"disclosure of private information" is a "harm [] traditionally recognized as providing a basis for lawsuits in American courts." 594 U.S. at 425 (citing *Davis v. FEC*, 554 U.S. 724, 733 (2008)). As the Seventh Circuit has explained, "a person commits this civil wrong if he 'gives publicity' to a matter that concerns 'the private life of another,' is 'highly offensive to a reasonable person,' and is not of legitimate public concern." *Nabozny*, 84 F.4th at 735.

The last three elements are straightforward: Facts regarding infertility are inherently private. Disclosure of those facts would be highly offensive to a reasonable person, and the services an individual seeks are not a legitimate public concern.

"The threshold element of publicity" presents a more difficult request. *Nabozny,* 84 F.4th at 735. "Public disclosure is the gravamen of the tort of" disclosure of private information. *Id.* at 737. Thus, the Seventh Circuit held in *Nabozny* that "without a public exposure component" and "alleged injuries not analogous to the harm at the core of the public-disclosure tort," making it "different *in kind* from that which the common law traditionally has recognized as actionable." *Id.* at 736-37.

Here, plaintiffs alleged disclosure to only a small number of recipients. However, "the distinction between public and private communication is not just a matter of numbers."

*Id.* at 736. Publicity "is a qualitative inquiry, not a quantitative one." *Id.* Thus, "while the number of recipients might be a relevant consideration," courts "must do more than simply count heads." *Id.* Applying that "qualitative inquiry," I conclude that *Nabozny* is distinguishable and that the harms plaintiffs allege bear a close relationship to those recognized by the tort of disclosure of private information. The defendant in *Nabozny* (a collection agency) had disclosed the plaintiff's private information -- there, information about a debt she owed -- only to a "third-party printing and mail vendor" who mailed a letter to plaintiff on the defendant's behalf. 84 F.4th at 733. *Nabozny* is thus distinguishable on two fronts: the type of information disclosed and the type of recipient.

First, the type of information allegedly disclosed in this case is even more sensitive than the information at issue in *Nabozny*. In *Nabozny* itself, the Seventh Circuit distinguished two cases involving claims under the disclosure provision of the Illinois Biometric Information Privacy Act, or BIPA. *Fox v. Dakkota Integrated Systems, LLC*, 980 F.3d 1146 (7th Cir. 2020), and *Cothron v. White Castle System, Inc.*, 20 F.4th 1156 (7th Cir. 2021) on precisely this ground. *See* 84 F.4th at 737.

The *Nabozny* court described *Fox* and *Cothron* as involving "immutable personal identifying information," the

disclosure of which "invades 'the private domain, much like an act of trespass.'" *Id.* (quoting *Fox*, 980 F.3d at 1155).

"By contrast," the "debt-related information" at issue in *Nabozny* was "far less identifying." *Id.*

Here, the information at issue is more akin to biometric information at issue in the BIPA cases than to the debt-related information at issue in *Nabozny*. And unlike the information at issue in *Dinerstein v. Google, LLC*, 73 F.4th 502 (7th Cir. 2023), the information at issue here has not been anonymized. *See Id.* at 513 to 514.

Second, the type of recipient at issue here is qualitatively different from *Nabozny*. The *Nabozny* court emphasized that the plaintiff there alleged only "the transmission of information to a single ministerial intermediary." *Id.* at 736. It noted, too, that disclosure to certain types of recipients, such as journalists, could constitute publicity even if the disclosure was made to only "a single person." *Id.*

Here, by contrast, the recipients of plaintiffs' information are large technology companies whose business models revolve around using information gathered about an individual to sell ad space to additional third parties. In *Salazar* -- a case that, like this one, involved disclosure via the Meta Pixel -- the Seventh Circuit distinguished *Nabozny* on precisely this ground. See 118 F.4th at 543.

Meta, it explained, "isn't a 'ministerial intermediary' like a mail vendor." *Id.* Moreover, "Meta's use of the disclosed data is very different from that of the mail vendor" because after a website using the Pixel "discloses users' personal ... information to Meta," Meta "harnesses that information to show the user-targeted ads -- ads that Meta chooses for its own commercial purposes" rather than for the user or the defendant website's purposes. *Id.*

Thus, "given the nature of the companies involved, intended and potential uses of the disclosed information and resulting in enhanced disclosure risks," the Second Circuit saw "little daylight between the nature of the harm ... allege[d] and the harm flowing from the public disclosure of private facts." *Id.* at 544.

The Seventh Circuit's decision in *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618 (7th Cir. 2014), provides further support for this distinction. The defendant in *Sterk* was a self-service video rental company that outsourced its customer service to a third party. *Id.* at 620-21. To enable the third party to perform that function, the defendant granted the third party "access to the database in which [the defendant] store[d] relevant customer information." *Id.* at 621.

Two of the defendant's customers sued, arguing that the disclosure of their information to the third-party customer

service provider violated the Video Privacy Protection Act. *Id.* at 621-22. Though it rejected plaintiff's claims on the merits, *Id.* at 626, the Seventh Circuit concluded the plaintiffs did have standing to seek damages for the disclosure. *Id.* at 623.

*Sterk* is factually similar to *Salazar* in that both involves disclosures of information about video subscribers to third parties who provided services for the defendant, and although the recipient in *Sterk* was not a "ministerial intermediary" like the recipient in *Nabozny*, neither was it a massive advertising company like Meta. Thus, *Sterk* confirms that *Salazar*, though not binding on courts in this circuit, is persuasive.

To be sure, *Sterk* predates *TransUnion* which "marked a shift in the [Supreme] Court's standing jurisprudence." *Dinerstein*, 73 F.4th at 516. It also predates *Nabozny*, but that does not mean that *Sterk* is "no longer authoritative." *Id.*.

Turning next to the common law tort of intrusion upon seclusion, plaintiffs' alleged injuries also bear a "close relationship" to the common law tort of intrusion upon seclusion. Like disclosure of private information, *TransUnion* listed "intrusion upon seclusion" as an "example" of a "harm [] traditionally recognized as providing a basis for lawsuits in American courts." 594 U.S. at 425. And the Seventh Circuit

has expressly held that analogy to intrusion upon seclusion can support concreteness under Article III. *See Gadelhak*, 950 F.3d at 462.

"Intrusion upon seclusion occurs when a person intrudes upon the solitude or seclusion of another or his private affairs or concerns, and this intrusion would be highly offensive to a reasonable person." *Pucillo v. National Credit Systems, Inc.*, 66 F.4th 634, 640 (7th Cir. 2023). While the requisite intrusion "may be by physical intrusion ... [i]t may also be by the use of the defendant's senses, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs, as by looking into his upstairs windows with binoculars or tapping his telephone wires." Restatement (Second) of Torts, Section 652B, comment b (1977).

"It may also be by some other form of investigation or examination into his private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents." *Id.* Unlike disclosure of private information, the tort of inclusion upon seclusion does not require "publication or other use of any kind." *Id.*

Some cases hold that one party to a private conversation tortiously intrudes upon the seclusion of the other party by surreptitiously recording the conversation.

*See, e.g.*, *Wall v. Canon Solutions America, Inc.*, 2017 WL 3873755, at *3 (D. Kan. 2017); *WVIT, Inc. v. Gray*, 1996 WL 649334, at *4 (Conn. Super. Ct. October 25, 1996).

The injury in such cases is nearly identical to the injury here. Thus, if those cases have a correct view of the common law, then plaintiffs' alleged injuries bear an extremely "close relationship" to intrusion upon seclusion.

Other cases, however, hold that a defendant "cannot plausibly be considered to have intruded on ... private communications that it was always the intended recipient of." *Kurowski v. Rush System for Health,* 683 F.Supp. 3d 836, 849 (N.D. Ill. 2023). But even assuming those cases are correct -- an issue I do not decide -- the relationship between plaintiffs' alleged harms and the harms recognized by the tort of inclusion upon seclusion are sufficiently close for Article III purposes.

Even if a party to a private conversation does not commit intrusion on seclusion by allowing a third party to surreptitiously listen in on the conversation, the third party does. *See, e.g.*, *Shulman v. Group W Products, Inc.*, 955 P. 2d 469, 490 (California 1998). And Article III "do[es] not require an exact duplicate." *TransUnion*, 594 U.S. at 433.

Rather, courts "look for a 'close relationship' in kind, not degree." *Gadelhak*, 950 F.3d at 462. Different circuits "have interpreted *TransUnion* in two different ways."

*Barclift v. Keystone Credit Services, LLC*, 93 F.4th 136, 145 (3d Cir. 2024). "Some espouse an element-based approach, wherein a plaintiff's alleged harm must not lack any element of the comparator tort that was essential to liability at common law." *Id.* But "others compare the kind of harm a plaintiff alleges with the kind of harm caused by the comparator tort." *Id.* at 144-45.

The Seventh Circuit has not weighed in on this question. *See id.* at 144 (noting that *Nabozny* applied both approaches and found standing under neither).

Like the Third and Tenth Circuits, I "view the second method as more faithful to *TransUnion*." *Id.* at 145; *accord Shields v. Professional Bureau of Collections of Maryland, Inc.*, 55 F.4th 823, 829 (10th Cir. 2022). That is because "*TransUnion* speaks only of harms, not elements." *Barclift*, 93 F.4th at 145. And the injury-in-fact analysis is about the injury the plaintiff suffered, not the facts surrounding that injury. It is, after all, the plaintiff's <u>injury</u> -- not the cause of action -- that must be "concrete."

Applying that method, I conclude that intrusion upon seclusion is a sufficient analog for plaintiffs' alleged harms. As mentioned earlier, a third party who surreptitiously listens in on a private conversation with only one party's consent intrudes upon the seclusion of the other party. *See Shulman*, 955 P. 2d at 490. That is what plaintiffs alleged here, that

Meta and Google "listened in" on plaintiffs' private communications with defendant. The only difference then is that plaintiffs are suing the third party rather than the conversation partner. But it is difficult to see why who plaintiffs chose to sue could determine whether the injury they suffered was sufficiently concrete. To be sure, choice of defendant can affect the standing analysis, but it does so through the causation and redressability components of Article III standing, not the injury-in-fact component.

Concluding otherwise would produce absurd results. For example, it would mean that neither Congress nor a state legislature could create a judicially cognizable cause of action for aiding and abetting unless common law recognized aiding and abetting as a means of committing the specific tort at issue. That cannot be the import of *TransUnion*.

Turning next to Congress's judgment. Congress's judgment also supports finding plaintiffs' injuries concrete. "Because Congress is well positioned to identify intangible harms that meet minimum Article III requirements, its judgment is also instructive and important." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016). Although it cannot "enact an injury into existence," Congress has the power to "elevate harms that exist in the real world ... to actionable legal status." *TransUnion*, 594 U.S. at 426.

As explained more fully later, Congress sought to

protect the source of information at issue here. In doing so, it confirmed that the harms plaintiffs allege are sufficiently concrete to support standing.

Accordingly, I will turn to the other components of a cognizable injury in fact, beginning with particularized.

The injury was particularized. An injury is "particularized" if it "affect[s] the plaintiff[s] in a personal and individual way" and is not "a generalized grievance." *Alliance for Hippocratic Medicine,* 602 U.S. at 381.

Here plaintiffs' injury is particularized because it was their own information that was allegedly disclosed.

And turning finally to the requirement of actual or imminent. The injury is "actual" because it has "already occurred." *Id.* Accordingly, plaintiffs have adequately alleged an injury in fact, and I'll turn to the other elements of Article III standing.

Next is causation. Causation, also known as traceability, is the only element of standing that defendant challenges in its motion to dismiss. To allege causation, the complaint must allege "that the plaintiff's injury likely was caused ... by the defendant's conduct." *Id.*, at 382. Defendant argues that the plaintiffs have not alleged causation because they have not shown that defendant was responsible for the advertisements plaintiffs received.

That argument is not persuasive because receiving the advertisements is not the injury by which plaintiffs seek to establish standing. The injuries plaintiffs do assert, that is, the disclosure of their personal information, were caused by defendant's conduct because it was defendant who installed the tracking technologies on their website and configured them to disclose the information. Accordingly, plaintiffs have satisfied the causation element of Article III standing.

And turning finally to redressability, plaintiffs' injury would be redressed by relief from this court. "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Diamond Alternative Energy, LLC v. EPA*, 145 S. Ct. 2121, 2133 (2025).

Turning next to statutory jurisdiction. Because plaintiffs have adequately alleged injury-in-fact, causation, and redressability, the complaint presents the sort of "real controversy with real impact on real persons" that "a federal court may resolve." *TransUnion*, 593 U.S. at 424.

For completeness, I also note that statutory jurisdiction is proper under 28 U.S.C. Section 1331 for plaintiffs' ECPA claim because that claim arises under federal law and 28 U.S.C. Section 1367(a) for plaintiff's state law claims because those claims form part of the same case or controversy as the ECPA claim.

Accordingly, I have subject matter jurisdiction, and defendant's motion to dismiss under Rule 12(b)(1) is denied.

Turning next to the Rule 12(b)(6) motion. Defendant argues that the complaint should be dismissed under Rule 12(b)(6) for failure to state a claim. As with assessing a facial challenge to standing, when assessing an argument that a complaint fails to state a claim, I must "accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Sherwood v. Marchiori*, 76 F.4th 688, 693 (7th Cir. 2023). And for the reasons I will explain, I will deny defendant's motion to dismiss under Rule 12(b)(6).

Beginning with Count I, in Count I, plaintiffs allege a violation of the Electronic Communications Privacy Act, or ECPA. As relevant here, the ECPA creates civil liability for "any person who ... intentionally intercepts ... any wire or electronic communication." 18 U.S.C. Section 2511(1)(a).

Defendant does not argue that plaintiffs have not alleged that they intercepted electronic communications. Rather, they point to the "party exception" which provides "it shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication...." *Id.* Section 2511(2)(d). In other words, "it is not unlawful for a party to intercept *its own*

communications." *Stein v. Edward-Elmhurst Health*, 2025 WL 580556, at *3 (N.D. Ill. February 21, 2025).

Plaintiffs acknowledge that defendant "is a 'party to the communication.'" Docket 27, paragraph 240. However, they argue that the "crime-tort exception" to the party exception applies. Under the crime-tort exception, the party exception does not apply if "such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any state." 18 U.S.C. Section 2511(2)(d).

To show the requisite crime or tort, plaintiffs point to the Health Insurance Portability and Accountability Act, or, HIPAA, which, as relevant here, makes it a crime for "[a] person" to "knowingly and in violation of [Sections 1320d to 1320d-9] disclose [] individually identifiable health information to another person." 42 U.S.C. Section 1320d-6(a)(3).

As a threshold matter, defendant argues that the alleged HIPAA violation cannot serve as the predicate crime or tort for the crime-tort exception because "a simultaneous tort arising from the act of recording itself is insufficient." *Caro v. Weintraub,* 618 F.3d 94, 100 (2d Cir. 2010). But here the act of intercepting a communication is distinct from, albeit simultaneous with, the act of disclosing the contents of that communication. Thus, "courts in this district" and "from

coast to coast" have recognized that "violation[s] of HIPAA can provide the predicate for the claim under the ECPA." *Stein*, 2025 WL 580556, at *4-5.

Defendant also contends that plaintiffs have not adequately alleged a violation of Section 1320d-6(a)(3). The court concludes that plaintiffs have adequately alleged a violation of this provision. First, defendant disclosed plaintiff's information to, among others, Meta and Google, who are "persons" within the meaning of the statute. *See* 42 U.S.C. Section 1301(a)(3)(defining "person" to include "a corporation").

Second, the information disclosed was individually identifiable health information under HIPAA. Although defendant argues that URLs are not IIHI, plaintiffs' allegations are not limited to URLs, and the information at issue is transmitted alongside plaintiff's Facebook IDs, which the complaint alleges are "unique and persistent identifier[s]" with "which anyone can look up the user's Facebook profile and name." *Id.*, paragraph 101.

Defendant asks the court to take judicial notice on the page of the Facebook website stating that a Facebook ID "doesn't identify you." See Docket 28 at page 11. The court can take judicial notice of the page "for the purpose of showing what statements the [webpage] contain[s], but not for the proof of the facts stated therein. *George v. Kraft Foods*

*Global, Inc.*, 674 F.Supp. 2d 1031, 1044 (N.D. Ill. 2009). Thus, it does not defeat plaintiffs' allegation that Facebook IDs are unique identifiers. Accordingly, the complaint alleges the disclosure of the IIHI.

Third, the disclosure was done "knowingly." The complaint alleges that the disclosure was intentional. Docket 27, paragraph 14. And "if the defendants acted intentionally, they acted knowingly." *Tuite v. Henry*, 1994 WL 55711, at *2 (N.D. Ill. February 22, 1994).

Fourth, the disclosure was "in violation of this part." The statute explains that disclosure is "in violation of this part if the information is maintained by a covered entity ... and the individual ... disclosed such information without authorization." 42 U.S.C. Section 1320d-6(a).

Defendant does not argue in its motion to dismiss that it is not a covered entity, and the complaint clearly alleges that the information was disclosed without authorization. See Docket 27, paragraph 48. Accordingly, plaintiffs have alleged that defendant's disclosure was "in violation of this part."

Thus, plaintiffs have plausibly alleged that the disclosure violated HIPAA. Defendant also argues, however, that the crime-tort exception is inapplicable because its purpose was marketing, not tortiously harming plaintiffs. "But the existence of a lawful purpose does not mean that the interception is not also for a tortious or unlawful purpose."

*Sussman v. American Broadcasting Companies, Inc.*, 186 F.3d 1200, 1202 (9th Cir. 1999). And "the language of the statute gives no hints that conduct falls outside the reach of the statute if a person acted based on financial motivations." *Stein*, 2025 WL 580556 at *5. Again, the crime-tort exception applies if the "communication is intercepted for the purpose of committing any criminal or tortious act." 18 U.S.C. Section 2511(2)(d). By "separating the adjectives from the noun," this language makes clear that the exception applies when two requirements are satisfied. "The purpose must be to commit an act, and that act must be criminal or tortious." *Stein*, 2025 WL 580556, at *6. "If the purpose is to do X and if X is a crime or a tort, then the crime-tort exception to the [party exception] applies." *Id.*

Fairly construed, the plaintiff alleges that defendant intercepted the communications for the purpose of disclosing the communications to Meta and Google. And as discussed previously, the alleged disclosure violated HIPAA. Therefore, the crime-tort exception applies, and thus the party exception does not. Accordingly, I decline to dismiss Count I.

Turning to Count II. In Count II, plaintiffs allege common law negligence. Defendant argues first that the negligence claim should be dismissed because defendant did not transmit private information. This argument is made in less than a sentence and not supported by any citation to any

authority. Thus, it is forfeited. Defendant also argues that the negligence claim should be dismissed because plaintiffs do not allege that they received advertisements from defendant. This argument, too, was undeveloped in the motion and thus is forfeited.

For the first time in its reply brief, defendant also argued that plaintiffs have not adequately alleged proximate causation because they received advertisements from other clinics rather than from defendant. Because it was raised for the first time in the reply brief, this argument is also forfeited. But even it was not forfeited, the argument is unpersuasive. As explained previously, the injury plaintiffs claim is the disclosure of information about their infertility, not their receipt of advertisements.

Thus, I will not dismiss Count II at this stage.

Turning to Count III. In Count III, plaintiffs allege unjust enrichment. In the motion to dismiss, defendant argues that this claim must be dismissed because unjust enrichment is not an independent cause of action under Illinois law and thus "stand[s] or fall[s] with the related claim[s]." *Cleary v. Philip Morris, Inc.*, 656 F.3d 511, 517 (7th Cir. 2011).

As discussed previously, however, plaintiffs' other claims survive the motion to dismiss. Thus, this argument is not persuasive.

In the reply brief, defendant argues for the first

time that the unjust enrichment claim must be dismissed because plaintiffs "received exactly what they bargained for." 35 at 6. Because this argument was not raised until the reply brief, it is forfeited.

Accordingly, I will not dismiss the unjust enrichment claim at this stage.

Turning to Count IV. In Count IV plaintiffs allege violation of the Illinois Eavesdropping Statute, or IES, 720 ILCS 5/14-1, and following. Defendant argues first that the IES claim must be dismissed because the communications at issue were not "private electronic communications," which the statute defines as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or part by a wire, radio, pager, computer, electromagnetic, photo electronic or photo optical system when the sending or receiving party intends the electronic communication to be private under circumstances reasonably justifying that expectation." 720 ILCS 5/14-1(e).

The statute defines a reasonable expectation to "include any expectation recognized by law." *Id.* Defendant argues that the information it disclosed was not covered by HIPAA and thus not subject to a reasonable expectation of privacy.

For the reasons explained before, that argument is not persuasive. And so this argument is not persuasive for the

dismissal of the IES claim.

Defendant also argues that communications from cell phones are not covered by the IES's definition of "electronic communications" because the statute provides that "electronic communication does not include any communication from a tracking device." 720 ILCS 5/14-1(e). Defendant cites *Vasil v. Kiip, Inc.*, 2018 WL 1156328 (N.D. Ill. March 5, 2018), in which the court held that "under the Illinois Eavesdropping Statute, a cell phone is a tracking device to the extent it performs tracking functions." *Id.* at *8.

But *Vasil* does not support defendant's position because it rejected the proposition that the IES "excludes protection for all communications from cell phones" under the tracking-device exclusion. *Id.*

Rather, it held that the tracking-device exclusion applied only to the transmission of geo-locational data. *Id.* Because the information at issue here is not geo-locational data, the tracking-device exclusion does not apply.

Defendant also contends that "courts have previously rejected plaintiffs' argument." Docket 28 at 17, but the case defendant cites involved a different provision of the IES that applies only to oral, not electronic, communications. *See A.D. v. Aspen Dental Management, Inc.*, 2024 WL 4119153, at *4 (N.D. Ill. September 9, 2024). Accordingly, the case is inapposite.

For the first time in the reply brief, defendant

argues that the IES claim must be dismissed because defendant was a party to the communication, but because this argument was raised for the first time in the reply brief, it is forfeited.

Accordingly, I will not dismiss Count IV at this time.

Turning next to the motion to strike class certification.

Defendant moves under Rule 23 to strike plaintiffs' class allegations. Rule 23(c)(1) directs that "at an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." "Most often, it will not be 'practicable' for the court to do that at the pleading stage." *Hill v. Wells Fargo Bank, N.A.*, 946 F.Supp. 2d 817, 829 (N.D. Ill. 2013). "Sometimes," however, "the complaint will make it clear that class certification is inappropriate." *Id.* For instance, denying class certification at the pleading stage is appropriate where "the plaintiff's class allegations are facially and inherently deficient." *Buonomo v. Optimum Outcomes, Inc.*, 301 F.R.D. 292, 295 (N.D. Ill. 2014).

"A plaintiff seeking to certify a class must satisfy the four requirements of Rule 23(a) -- numerosity, typicality, commonality, and adequacy of representation -- as well as one of the categories in Rule 23(b)." *Scott v. Dart*, 99 F.4th 1076, 1088 (7th Cir. 2024). Defendant's motion to dismiss discusses only one of these requirements: numerosity. They

also argue in their reply brief that two others -- commonality and typicality -- are not satisfied; but because they were raised for the first time in the reply brief, those arguments are forfeited. And accordingly, I will address only the numerosity requirement.

The complaint seeks to certify both a Nationwide Class and an Illinois Sub-Class. The Nationwide Class is defined in the complaint as "all individuals residing in the United States who used Defendant's Website and had their Private Information shared with unauthorized third parties including, but not limited to, Facebook during the applicable statutory period." Docket 27, paragraph 205.

The Illinois Sub-Class is defined as "All individuals residing in Illinois who used Defendant's Website and had their Private Information shared with unauthorized third parties including, but not limited to, Facebook during the applicable statutory period." *Id.*, paragraph 206.

The complaint alleges that although "the exact number of class members is unknown to plaintiffs at this time ... it is estimated that there are at least thousands of individuals in the classes." *Id.*, paragraph 212.

At this stage, I cannot conclude that these allegations are "facially and inherently deficient." *Buonomo*, 301 F.R.D. at 295. While "a class of 40 or more does not guarantee numerosity," *Anderson v. Weinert Enterprises, Inc.*,

986 F.3d 773, 777 (7th Cir. 2021), the Seventh Circuit has recognized that "a 40-member class is often regarded as sufficient to meet the numerosity requirement." *Orr v. Schicker*, 953 F.3d 490, 498 (7th Cir. 2020).

While neither party has presented evidence of the size of the proposed class, it is at least plausible that it well exceeds that number and that "the class is so numerous that joinder of all members is impracticable." Federal Rule of Civil Procedure 23(a)(1).

Because that question can only be answered definitively after discovery into the size of the proposed class, it would not be appropriate to strike class allegations at this stage.

To summarize and conclude for the reasons I've explained, I will deny the motion to dismiss for lack of subject matter jurisdiction and failure to state a claim and to strike class allegations. And, again, that would be Docket 28.

And so the next step would be to set an answer deadline. I believe under the rules, there's a default deadline. I think it is 14 days, but we can set a different deadline if defendant requests.

MR. IBARRA: Your Honor, I would.

I'm sorry, Your Honor. This is Jonathon Ibarra on behalf of defendant. I would ask for 28 days to file a response.

THE COURT: Okay. Any objection from the plaintiffs?

MR. BECK: Stephen Beck, Your Honor.

No objection from the plaintiffs.

THE COURT: Okay. So I'll set the answer deadline for 28 days from now, which is September 5th, 2025.

Do you want to also set any sort of status report? I mean, so I'm happy to either set a status report or a status hearing if that would be helpful.

Typically, when I have an answer come in and the case is going into discovery, I would pretty often refer that to the magistrate judge for discovery supervision and settlement. Here, the assigned magistrate judge is Judge Appenteng. And so that's the likely next step once I see the answer come in. But if the parties would like to either file a status report or hold a status hearing, you know, in addition to that referral or before that referral goes through or anything along those lines, I am happy to also set again either a status report or status deadline.

MR. IBARRA: I'll go first, Your Honor. Jonathon Ibarra on behalf of the defendant.

I think, you know, we've had a very good working relationship with plaintiffs' counsel. I think we could just submit a status report to Your Honor.

THE COURT: Okay.

MR. BECK: And Stephen Beck from the plaintiffs, Your

Honor.

That sounds fine with us, too.

THE COURT: Okay. Would you like to do that both before or after that answer deadline? Either one is okay.

MR. BECK: Stephen Beck for the plaintiffs, Your Honor.

I think it might make sense to submit it after the deadline.

MR. IBARRA: Your Honor, Jonathon Ibarra, defendant.

Agreed. Maybe, like, we could do it the following Friday, September 12th.

THE COURT: Okay. That sounds good. Does that date work for the plaintiffs?

MR. BECK: Yes, that works for us, Your Honor.

THE COURT: Okay. Sounds good. September 12th will be the joint status report deadline, and that's just for any proposed next steps.

I may go ahead and enter the referral anyway once I see the answer come in on September 5th because, you know, if for some reason you don't need the referral, then it can always be closed; but if you do need the referral, then it's underway and it saves us some time just logistically getting that in process.

All right. Anything else we need to discuss?

MR. BECK: Stephen Beck, Your Honor.

Nothing else from the plaintiffs.

MR. IBARRA: Your Honor, Jonathon Ibarra for the defendant.

Nothing more. Thank you.

THE COURT: Okay. Thank you both very much. Thank you for your time. Take care.

MR. BECK: Thank you, Your Honor.

MR. IBARRA: Thank you, Your Honor.

THE COURT: Bye.

(Concluded at 10:14 a.m.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/Kathleen M. Fennell* *August 9, 2025*
Kathleen M. Fennell Date
Official Court Reporter