**BARG SINGER HOESLY PC**
Cody Hoesly (OSB No. 052860)
choesly@bargsinger.com
121 SW Morrison Street, Suite 600
Portland, OR 97204
Telephone: (503) 241-8521

**BURSOR & FISHER, P.A.**
Sarah N. Westcot (*pro hac vice* forthcoming)
Stephen A. Beck (*pro hac vice*)
701 Brickell Ave., Suite 2100
Miami, FL 33131
Tel: (305) 330-5512
Fax: (305) 676-9006
E-Mail: swestcot@bursor.com
sbeck@bursor.com

*Attorneys for Plaintiff and the Putative Class*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| B.N., individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Oregon Reproductive Medicine, LLC d/b/a ORM Fertility,<br><br>Defendant. | Case No. 3:25-cv-00202-IM<br><br>**PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY** |

**PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY**

Plaintiff B.N. ("Plaintiff") respectfully submits this Notice of Supplemental Authority regarding Defendant Oregon Reproductive Medicine, LLC d/b/a ORM Fertility's pending Motion to Dismiss. *See* ECF Nos. 11, 14, 15. Plaintiff brings to this Court's attention a recent decision by the

Honorable Nancy E. Brasel in *Vriezen v. Infinite Health Collaborative*, Case No. 0:24-CV-03743 (D. Minn. Sept. 30, 2025) (ECF No. 48). A copy of the written order is attached hereto as **Exhibit 1**.

The facts in the current matter closely mirror those of *Vriezen*, which also involved the disclosure of personal health information entered on a public-facing website (as opposed to a patient portal). In *Vriezen*, the Court denied the defendant's motion to dismiss the plaintiffs' claims for: (1) violation of the Electronic Communications Privacy Act; (2) violation of the Minnesota Protection of Communications Act; (3) intrusion upon seclusion; (4) negligence; (5) breach of implied covenant; (6) unjust enrichment; (7) violation of the Minnesota Uniform Deceptive Trade Practices Act; and (8) violation of the Minnesota Health Records Act.

Dated: October 29, 2025

**BARG SINGER HOESLY PC**

By: */s/ Cody Hoesly*
Cody Hoesly

**BARG SINGER HOESLY PC**
Cody Hoesly (OSB No. 052860)
choesly@bargsinger.com
121 SW Morrison Street, Suite 600
Portland, OR 97204
Telephone: (503) 241-8521

**BURSOR & FISHER, P.A.**
Sarah N. Westcot (*pro hac vice* forthcoming)
Stephen A. Beck (*pro hac vice*)
701 Brickell Avenue, Suite 2100
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: swestcot@bursor.com
sbeck@bursor.com

*Attorneys for Plaintiff and the Putative Class*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| KELLY VRIEZEN, BREYANNA NELSON and JOYCE LACEY, individually, and on behalf of those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>INFINITE HEALTH COLLABORATIVE, P.A., d/b/a TWIN CITIES ORTHOPEDICS, P.A.,<br><br>Defendant. | Case No. 24-CV-3743 (NEB/DJF)<br><br>ORDER ON DEFENDANT'S MOTION TO DISMISS |

Kelly Vriezen, Breyanna Nelson, and Joyce Lacey ("Plaintiffs") bring a purported class action against Infinite Health Collaborative, P.A., d/b/a Twin Cities Orthopedics, P.A. ("TCO"). They allege that they submitted protected health information to TCO's public-facing website, and that TCO sold that information to Meta and Google, resulting in unwanted advertisements on their Facebook and Google pages. TCO now moves to dismiss all claims. For the reasons below, TCO's motion (ECF No. 36) is granted in part and denied in part.

## BACKGROUND[1]

### I. TCO's Public-Facing Website and Its Use of Tracking Tools

TCO provides primary care and research services related to orthopedics at medical clinics across Minnesota and Wisconsin. (ECF No. 27[2] ("Am. Compl.") ¶ 5.) Like most businesses, TCO owns, maintains, and controls a website (www.tcomn.com) that does not require users to log in to gain access to it. (*Id.* ¶ 6.) On this public-facing website, users may (i) request appointments with TCO's physicians and related medical care, (ii) research medical conditions and treatments, and (iii) look up specialty orthopedic physicians. (*Id.*)

The privacy policy on TCO's public-facing website states that TCO will keep protected health information ("PHI") private and confidential. (*Id.* ¶¶ 97–98 (p. 50).) TCO also represents that it will "not use or disclose your private medical information for marketing purposes, nor will i-Health sell your private medical information for marketing purposes without your written consent." (*Id.* ¶ 99 (p. 51).)

TCO allegedly installed and used several tracking tools on the website: TCO configured Meta Pixel to allow personal information that a user enters into the website's

---

[1] The Court draws the following background from the Amended Complaint, accepting as true all factual allegations and drawing all reasonable inferences in Plaintiffs' favor as the nonmovants. *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014).

[2] The paragraph numbers in the Amended Complaint are out of sequence. It contains three sets of Paragraphs 27 to 50, on pages 9–14, 14–22, and 37–50. When citing a repeated paragraph number that is not the first of its kind, the Court includes the page number.

appointment-request form—such as name, phone, and email—to be captured and disclosed to Facebook. (*Id.* ¶ 27 (p. 37); *see id.* ¶¶ 7–9, 16–18, 92 (p. 33).) TCO also installed Google Analytics and Google DoubleClick on the website, which uses cookies to identify the web browser from which the user is sending a communication and allow Meta and Google to know the user's location and IP address. (*Id.* ¶¶ 7, 31 (p. 10), 36–37 (p. 40), 41–42 (p. 41).) So, for example, by combining the information a person submits on TCO's appointment-request form with the information captured by cookies, one can determine much about the identity of the prospective patient. (*Id.* ¶¶ 20, 26–28, 101 (pp. 37–38), 41 (p. 41).)

## II. Plaintiffs' Use of TCO's Public-Facing Website

Plaintiffs are Minnesota residents and TCO patients who used this website. (*Id.* ¶¶ 41–43, 48 (p. 42), 65 (p. 45), 82 (p. 48).) Plaintiffs' "searches for information" related to their medical conditions and treatment options included visiting specific webpages, and Plaintiffs allege that the URLs from their searches reveal their PHI. (*Id.* ¶¶ 48, 65, 82.) For example, Plaintiffs searched for second opinions about their medical conditions and for TCO physicians specializing in their medical conditions; TCO disclosed this information to Meta and Google. (*Id.* ¶¶ 48, 54 (p. 43), 65, 71 (p. 46), 82, 88 (p. 48); *see also id.* ¶¶ 100–01, 27–28 (pp. 36–38) (screenshots of TCO appointment webpages and their tracking of data).) Two Plaintiffs—Lacey and Nelson—allege that they made appointments for their medical conditions using the website. (*Id.* ¶¶ 48, 65.)

Vriezen, Lacey, and Nelson have active Facebook and Google accounts. (*Id.* ¶¶ 50 (p. 42), 67 (p. 45), 84 (p. 48).) After they used TCO's website, they began receiving advertisements targeting their medical conditions on their Facebook accounts. (*Id.* ¶¶ 51 (p. 43), 68 (p. 45), 85 (p. 48).) They never consented to the disclosure of their health information to third parties, and they expected that their communications with TCO via its website would not be transmitted to a third party like Meta. (*See id.* ¶¶ 52 (p. 43), 55 (p. 43), 69–70 (p. 45–46), 72 (p. 46), 86 (p. 48), 89 (p. 49).)

## III. This Litigation

Plaintiffs bring claims under several statutes: the Electronic Communications Privacy Act, 18 U.S.C. § 2511; the Minnesota Protection of Communications Act, Minn. Stat. § 626A.02; the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. §§ 325D.43–48; the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.69, *et seq.*; and the Minnesota Health Records Act, Minn. Stat. § 144.291. Plaintiffs also raise common-law claims for invasion of privacy, negligence, breach of implied contract, and unjust enrichment. TCO now moves to dismiss the Amended Complaint under Rules 8(a) and 12(b)(6) of the Federal Rules of Civil Procedure.

# ANALYSIS

## I. Rule 8 of the Federal Rules of Civil Procedure

Under Rule 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8's

primary purpose is "to allow [the] court and [the] opposing party to understand whether [a] valid claim is alleged and, if so, what it is." *Cody v. Loen*, 468 F. App'x 644, 645 (8th Cir. 2012) (per curiam) (citation omitted). A complaint must be sufficiently clear so the court or opposing party "is not required to keep sifting through it in search of what it is plaintiff asserts." *Id.* (citation omitted).

TCO argues that the Amended Complaint should be dismissed because its length (99 pages) and unnecessary tangents violate the spirit of Rule 8. The Amended Complaint contains 68 pages of factual allegations. These allegations are followed by nine counts that incorporate the prior allegations and state the basis for relief under each legal theory. The allegations put TCO on notice of the conduct on which the claims are based and thus the Amended Complaint is not the type of pleading that violates Rule 8. *Cf. Iverson v. City of Brooklyn Ctr.*, No. 23-CV-917 (NEB/LIB), 2024 WL 3178041, at *1–2 (D. Minn. Mar. 11, 2024) (dismissing 338-page "'kitchen-sick' or 'shotgun' complaint" under Rule 8 "where it is so confused and sprawling that it places an unjustified burden on the responding party"), *aff'd*, No. 24-2691, 2024 WL 5415776 (8th Cir. Oct. 16, 2024).

One caveat to this ruling: the numbering of several paragraphs in the Amended Complaint is duplicated and out of sequence. To avoid future confusion, the Court orders Plaintiffs to file a new version of the Amended Complaint that corrects the paragraph numbering.

## II. Rule 12(b)(6) of the Federal Rules of Civil Procedure

To survive a Rule 12(b)(6) motion, a complaint "must contain 'enough facts to state a claim to relief that is plausible on its face.'" *Horras v. Am. Cap. Strategies, Ltd.*, 729 F.3d 798, 801 (8th Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). At this stage in the litigation, the Court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009). Factual allegations in the complaint need not be detailed, but "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted).

Courts may consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned; without converting" a Rule 12(b)(6) motion into one for summary judgment. *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) (quotation marks and citation omitted). The Amended Complaint embraces TCO's public-facing website, and the parties rely on the website in their briefing. (*E.g.*, ECF No. 43 at 23, ECF No. 44 at 2–3.) Thus, the Court will consider TCO's website without converting the motion to one for summary judgment. *E.g.*, *Okash v. Essentia Health*, No. 23-CV-482 (JRT/LIB), 2024 WL

1285779, at *2 n.1 (D. Minn. Mar. 26, 2024) ("The Court may take judicial notice of the contents of Essentia's website; after all, a complaint necessarily embraces a website when a defendant's conduct on that website is central to the dispute.").

## III. PHI and TCO's Public-Facing Website

The first question the Court must answer is whether the information Plaintiffs gave to TCO through the website constitutes protected health information, or PHI. If the information is not PHI, all the claims fail for obvious reasons. The answer to whether the information is PHI, however, is less than obvious.

First, the statutory definition: PHI refers to health information covered by the confidentiality protections of the Health Insurance Portability and Accountability Act ("HIPAA"), Pub. L. No. 104-191, 110 Stat. 1936 (1996).[3] (*See* Am. Compl. ¶ 130.) It includes "individually identifiable health information", or IIHI which is the subset of PHI that Plaintiffs allege TCO disclosed. HIPPA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider, health plan, employer, or health care clearinghouse; and (B) relates to the past,

[3] Under HIPAA,

> The term "health information" means any information, whether oral or recorded in any form or medium, that
> (A) is created or *received by a health care provider*, health plan, public health authority, employer, life insurer, school or university, or health care clearinghouse; *and*
> (B) *relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual*, or the past, present, or future payment for the provision of health care to an individual.

42 U.S.C. § 1320d(4) (emphasis added); *see* 45 C.F.R. 160.103.

> present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, *and*—(i) *identifies the individual*; *or* (ii) with respect to which *there is a reasonable basis to believe that the information can be used to identify the individual*.

42 U.S.C. § 1320d(6) (emphasis added); *see* 45 C.F.R. 160.103; *Use of Online Tracking Techs. by HIPAA Covered Entities & Bus. Assocs.*, U.S. Dep't of Health & Human Servs., https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html [https://perma.cc/9N9V-M2MU] at 16–17 n.20 ("HHS Bulletin"). The definition of IIHI is "inclusive, meaning information must satisfy *both* the 'relates to' clause *and* the 'identifies' clause to be classified as IIHI."[4] *Am. Hosp. Ass'n v. Becerra*, 738 F. Supp. 3d 780, 801 (N.D. Tex. 2024).

To clear some brush away: this action is not about information submitted through TCO's patient portal.[5] TCO acknowledges that information disclosed through a patient portal can be PHI. (ECF No. 44 at 2.) But Plaintiffs do not allege that TCO disclosed any

---

[4] The Amended Complaint repeatedly references personally identifiable information ("PII") in the context of PHI. (*E.g.*, Am. Compl. ¶¶ 9, 31 (p. 10), 189, 285, 290.) In their opposition brief, Plaintiffs acknowledge that "PII on its own is not protected by HIPAA." (ECF No. 43 at 17.) Rather, they maintain that "when PII is combined with health information"—thereby constituting IIHI—the information is protected by HIPAA. (*Id.*) And so the Court refers to PHI and IIHI in this Order.

[5] "A patient portal is a secure online website that gives patients convenient, 24-hour access to personal health information from anywhere with an Internet connection. Using a secure username and password, patients can view health information," communicate with health providers, and more. *See Frequently Asked Questions-Patient Portal*, Assistant Sec'y for Tech. Pol'y/Office of the Nat'l Coordinator for Health Info. Tech., https://www.healthit.gov/faq/what-patient-portal [https://perma.cc/S9M4-EMA9].

information obtained through its patient portal. Rather, the Amended Complaint describes solely Plaintiffs' use of TCO's *public-facing* website, alleging that TCO tracked and disclosed to third parties Plaintiffs' PHI, including "computer IP addresses, patient status, health conditions and symptoms, treatments, physicians, appointment details, and unique personal identifiers used to link the sensitive web communications to Plaintiffs."[6] (Am. Compl. ¶ 20.)

Generally, "[i]nformation available on publicly accessible websites stands in stark contrast to the personally identifiable patient records and medical histories protected by these statutes—information that unequivocally provides a window into an individual's personal medical history." *Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018) (affirming dismissal of complaint alleging violations of federal and state law by collecting and using plaintiff's browsing data collected from various healthcare-related websites). Some courts have concluded that searches for doctors and treatments on a healthcare

---

[6] The Amended Complaint does not allege facts suggesting that TCO's website allows patients to view health records, communicate with their health providers, or refill prescriptions. Nor does it allege facts suggesting that the website possessed patients' appointment details, medical records, or patient billing records. At oral argument, Plaintiffs' counsel directed the Court to a screenshot of the website in the Amended Complaint that shows "Pay Bill" and "Schedule Online" hyperlinks. (*See* Am. Compl. at 35.) The Amended Complaint contains no factual allegations about these hyperlinks, the webpages to which they link, or Plaintiffs' use of them. The Court observes that both hyperlinks take users to webpages with other hyperlinks to a patient portal; the scheduling page also contains a hyperlink for TCO's appointment-request form. Aside from the appointment-request form (discussed below), these webpages suggest that patients pay bills and schedule appointments online via TCO's patient portal, which is beyond the scope of the Amended Complaint.

provider's public-facing website containing "general health information that is accessible to the public at large" is not PHI. *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 955 (N.D. Cal. 2017), *aff'd*, 745 F. App'x 8; *see, e.g.*, *K.L. v. Legacy Health*, No. 3:23-CV-1886-SI, 2024 WL 4794657, at *4 (D. Or. Nov. 14, 2024) (rejecting patient's breach-of-confidence claim based on searches on defendant's public website because "generic search queries created during such browsing activity [for burn specialists and burn treatments] . . . do not constitute PHI"); *but see Cousin v. Sharp Healthcare*, 702 F. Supp. 3d 967, 973 (S.D. Cal. 2023) (denying motion to dismiss where plaintiffs allegedly searched defendant's website for doctors who specialize in their medical conditions and for information about their conditions and booked an appointment for treatment of a medical condition).

The United States Department of Health and Human Services ("HHS") weighed in on this issue in a bulletin on HIPAA-covered entities' use of online tracking technologies. The HHS Bulletin provided that when an online technology connects (1) an individual's IP address with (2) a visit to an unauthenticated public webpage with the intent to address the visitor's specific health conditions or healthcare providers, it is IIHI:

> the mere fact that an online tracking technology connects the IP address of a user's device (or other identifying information) with a visit to a webpage addressing specific health conditions or listing health care providers *is* . . . a sufficient combination of information to constitute IIHI *if* the visit to the webpage is . . . related to [the user's own health.]

HHS Bulletin, at 4–5 [https://perma.cc/9N9V-M2MU] (emphasis added, double negative omitted). Healthcare entities objected to this provision in *American Hospital Association v.*

*Becerra*, 738 F. Supp. 3d at 789. There, the Northern District of Texas court concluded that because an individual does not transmit their subjective intent in using or searching for a webpage to the healthcare entity, this combination of information is *not* IIHI.[7] *Id.* at 802–04. The court explained that "information cannot become IIHI based solely on the visitors' subjective motive for visiting the page, which is not *information* that the [HHS Bulletin] requires the healthcare provider or third-party vendor to *receive* at all." *Id.* at 803. The court declared the provision unlawful and ordered that it be vacated. *Id.* at 807. HHS did not appeal the ruling. *See* HHS Bulletin, at 1 [https://perma.cc/9N9V-M2MU].

With all of this in mind, the Court agrees that most of the information described in the Amended Complaint is not PHI and thus cannot support Plaintiffs' claims.

As to Plaintiff Vriezen: her interactions with TCO's website were limited to queries about medical conditions, "TCO physicians, locations, . . . same-day surgery options," and "treatment options." (Am. Compl. ¶ 82 (p. 48).) Without more establishing a connection to Vriezen's status as a TCO patient (*e.g.*, requesting an appointment), these queries are not PHI or IIHI. *See, e.g.*, *Smith*, 745 F. App'x at 9 ("[T]he connection between a person's browsing history and his or her own state of health is too tenuous to support

---

[7] The *Becerra* court did not address the HHS Bulletin in its entirety, noting that it "contains an array of guidance for covered entities, much of which is both legally and pragmatically sound." *Id.* at 792 n.3. Plaintiffs contend that the sound guidance includes prohibiting the "[d]eploying tracking technologies on unauthenticated webpages that 'permits individuals to schedule appointments or use a symptom-checking tool.'" (ECF No. 43 at 22); *see* HHS Bulletin, at 7 [https://perma.cc/9N9V-M2MU].

[the] contention that the disclosure requirements of HIPAA . . . appl[ies.]"). The Amended Complaint fails to plausibly allege that TCO possessed Vriezen's PHI or IIHI. Vriezen's claims must therefore be dismissed.

In contrast, Plaintiffs Lacey and Nelson allege that they disclosed information that is plausibly PHI. They "us[ed]" TCO's website to "make appointments" for their conditions, and their "searches for information" included "visiting" the website's "appointment tool." (Am. Compl. ¶¶ 48 (p. 42), 65 (p. 45).) The Amended Complaint includes a screenshot of TCO's appointment-request form and its tracking of user data, including name, phone number, and email address. (*Id.* at 38.) TCO's appointment-request form requires users to provide their contact information to submit an appointment request. (*See* ECF No. 44 at 2–3; ECF No. 43 at 23; *see also* Am. Compl. ¶ 33 ("TCO designed and maintained its Website so that Users would be required to submit Private Information in order to . . . make appointments").) Plaintiffs argue that "[b]y combining the information captured by the cookies (location and IP address) with the information submitted on the book an appointment form captured by the Tracking Tools (name and email), TCO disclosed PHI in violation of HIPAA." (ECF No. 43 at 21.)

As noted above, individually identifiable information "received by a health care provider" that "relates to the past, present, or future physical . . . health or condition of an individual, [or] the provision of health care to an individual" constitutes IIHI, and thus PHI, under HIPAA. 42 U.S.C. § 1320d(6); 45 C.F.R. § 160.103. TCO's appointment-request

form includes a required field for "Patient Name"—identifying patient status—and thus appears to constitute PHI under HIPAA.[8] (ECF No. 44 at 3); *see In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 792 (N.D. Cal. 2022) ("[I]nformation which shows patient-status constitutes protected health information."); 45 C.F.R. § 164.514(b)(2)(i) (requiring the removal of an individual's name and contact information to de-identify the individual's PHI). It is plausible that the information transmitted when a user requests an appointment with TCO is information that is "received by a health care provider" that "relates to . . . the provision of health care to an individual," *i.e.*, the requested appointment, and "with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.'" *Kane v. Univ. of Rochester*, No. 23-CV-6027-FPG, 2024 WL 1178340, at *6 (W.D.N.Y. Mar. 19, 2024) (citing 42 U.S.C. § 1320d(6)).

The Amended Complaint alleges that Lacey and Nelson made appointments using TCO's website and that "Pixel and other Tracking Tools secretly intercepted, recorded and transmitted those private communications to Meta and Google along with unique identifiers Meta and Google could use to identify Plaintiffs." (Am. Compl. ¶¶ 49 (p. 42), 66 (p. 45); *see id.* ¶ 19 ("Plaintiffs used the Website to . . . make appointments with TCO

[8] Users may also disclose the reason for their visit, diagnosis, and referring doctor in the appointment-request form, though the form appropriately discourages users from including sensitive or confidential information. *Appointment Request*, Twin Cities Orthopedics, https://tcomn.com/appointment-request/ [https://perma.cc/9CBP-ERF2]; (*see* ECF No. 44 at 2.)

specialists for their specific medical conditions"); *id*. ¶ 26 (alleging Plaintiffs used TCO's website to submit information relating to their health conditions including "booking of medical appointments for their health conditions").) TCO disputes whether the appointment-request form can be used to "make" an appointment, but that is, of course, a factual dispute unsuited for this motion.

Thus, accepting as true the factual allegations and drawing all reasonable inferences in Plaintiffs' favor as the nonmovants, *Braden*, 588 F.3d at 594, the Amended Complaint plausibly alleges that Lacey and Nelson at least requested appointments using the TCO website's appointment-request form, and in doing so, gave TCO their names and contact information. *See Nienaber v. Overlake Hosp. Med. Ctr.*, No. 2:23-CV-01159-TL, 2025 WL 692097, at *6 (W.D. Wash. Mar. 4, 2025) (distinguishing *Becerra* in part because "[p]laintiff's patient status was part of the information allegedly disclosed by Defendant"). Because patient status constitutes PHI, the Court concludes that the Amended Complaint plausibly alleges that TCO possessed Lacey's and Nelson's PHI.

With that initial question answered, the Court turns to those two Plaintiffs' substantive claims.[9]

---

[9] Plaintiffs withdrew their claim under the Minnesota Consumer Fraud Act (Count VIII) without prejudice. (ECF No. 43 at 11 n.2.)

## IV. Counts I and II: Wiretap Statutes

The Electronic Communications Privacy Act, 18 U.S.C. § 2511 ("ECPA"), and the Minnesota Protection of Communications Act, Minn. Stat. § 626A.02 ("MPCA") prohibit the unauthorized interception of electronic communications.[10] To plead a prima facie case under the ECPA, a plaintiff must show that the defendant "(1) intentionally (2) intercepted, endeavored to intercept or procured another person to intercept or endeavor to intercept (3) the contents of (4) an electronic communication, (5) using a device." *Mekhail v. N. Mem'l Health Care*, 726 F. Supp. 3d 916, 924 (D. Minn. 2024) (citing *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 135 (3d Cir. 2015)). "It is also a violation of the ECPA to use the contents of a communication that a person knows was unlawfully intercepted." *Id.* (citing 18 U.S.C. § 2511(1)(d)).

### *A. Contents*

TCO contends that the ECPA and MPCA claims fail because the Amended Complaint lacks allegations that TCO intercepted or disclosed the "contents" of their communications. "Contents" are "any information concerning the substance, purport, or meaning of [a] communication." 18 U.S.C. § 2510(8); Minn. Stat. § 626A.01, subdiv. 8. The

[10] Because the ECPA and MPCA are "nearly identical," the Court analyzes the federal and state statutes together. *Wilson v. McRae's US Mail Serv. Inc.*, No. 0:20-CV-01664 (PJS/KMM), 2020 WL 6808861, at *4 (D. Minn. Oct. 29, 2020), *report & recommendation adopted*, 2020 WL 6802395 (D. Minn. Nov. 19, 2020).

parties dispute whether "contents" includes "record information regarding the characteristics of the message." (ECF No. 38 at 25.)

TCO asks the Court to apply the reasoning in *In re Zynga Privacy Litigation*, 750 F.3d 1098 (9th Cir. 2014). There, the Ninth Circuit held that under the ECPA, "'contents' refers to the intended message conveyed by the communication, and does not include record information regarding the characteristics of the message that is generated in the course of the communication." *Id.* at 1106; *see id.* at 1106–08 (concluding that names, Facebook IDs, and webpage addresses are not "contents" under the ECPA). *Zynga* is not binding on this Court. Other courts have concluded that "a URL with only basic identification and address information is not content. However, a URL that discloses a 'search term or similar communication made by the user' can be considered a communication under the statute."[11] *In re Grp. Health Plan Litig.*, 709 F. Supp. 3d 707, 718 (D. Minn. 2023) (citing *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1075–76 (N.D. Cal. 2023)); *see id.* (concluding that plaintiffs alleged "content" comprising of their "private information, including 'symptoms, medical conditions, physician lookup, treatment, medication, *and scheduling*'" (emphasis added)).

[11] In *Mekhail*, the court did not decide "whether URLs, webpage addresses, and the like constitute 'contents'" because the complaint went "much farther, clearly alleging that substantive information, including details about medical appointments, conditions, and treatments, was obtained via the Pixel." 726 F. Supp. 3d at 926.

Plaintiffs allege that some of the TCO website's URLs include medical search terms *e.g.*, hand-and-wrist care, which are substantive content of the communications, and that users can make appointments with medical specialists. (Am. Compl. ¶¶ 95–101 (pp. 33–37).) The Amended Complaint plausibly alleges that Lacey and Nelson requested appointments with TCO, and that when a user requests an appointment via TCO's website, the Pixel receives the user's contact information and the URL from TCO's public-facing website. (*E.g.*, Am. Compl. at 37–38 (Figures 6 & 7); *see, e.g.*, *id.* ¶¶ 99–101, 27–29, 39 (pp. 37–39, 41).) From these URLs, Facebook can discern the substance of the communications: a request to schedule an appointment with TCO for the person named. And so, Lacey and Nelson have sufficiently pled that TCO disclosed the "contents" of these communications.

***B. Exceptions***

TCO next argues that a "party exception" to the ECPA and MPCA applies. These statutes carve out communications when one person "is a party to the communication or where one of the parties to the communication has given prior consent to such interception." 18 U.S.C. § 2511(2)(d); Minn. Stat. § 626A.02, subdiv. 2(d). This "party exception" does not apply if the "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d); *see* Minn. Stat. § 626A.02,

subdiv. 2(d); *Mekhail*, 726 F. Supp. 3d at 927 (assuming without deciding that "the party exception presumptively applies to *any* alleged violation of ECPA").

The parties do not dispute that TCO may invoke the party exception to the wiretap statutes, because TCO was the intended recipient of the allegedly intercepted communications. *See In re Google Inc.*, 806 F.3d at 143 ("[T]he intended recipient of a communication is necessarily one of its parties."). Their dispute is one layer down: the applicability of the crime-tort exception to the party exception under a four-part test: (i) purpose, (ii) independence, (iii) contemporaneousness, and (iv) intent to harm. *Caro v. Weintraub*, 618 F.3d 94, 100 (2d Cir. 2010).

*Purpose*. For the crime-tort exception to apply, the interception must have been "for the purpose of committing any criminal or tortious act." 18 U.S.C. § 2511(2)(d). Plaintiffs allege that TCO intercepted their electronic communications for the purpose of violating HIPAA by collecting and disclosing their PHI without consent, thereby invading their privacy. (ECF No. 43 at 28–29; *see* Am. Compl. ¶¶ 36 (p. 12), 180–87.) Courts in this District have found that plaintiffs plausibly alleged the crime-tort exception based on HIPAA violations and an invasion of privacy arising out of the alleged interception. *See In re Grp. Health*, 709 F. Supp. 3d at 719 (sufficiently alleging that the interception was motivated by "marketing and revenue generation," which was a HIPAA violation and an invasion of privacy); *Mekhail*, 726 F. Supp. 3d at 928 ("[T]he allegation that the Pixel allowed Meta to access Ms. Mekhail's private health data, with the purpose

of monetizing that data, is sufficient to plead" an MHRA violation and an unjust enrichment claim, and invoked HIPAA). Plaintiffs adequately allege a tortious purpose; discovery is needed to determine TCO's actual purpose for installing and using the tracking tools. *See In re Grp. Health*, 709 F. Supp. 3d at 720.

*Independence*. "[T]o plead the crime-tort exception, the allegedly unlawful act must be independent of the allegedly unlawful interception."[12] *Mekhail*, 726 F. Supp. 3d at 927 (citing *Caro*, 618 F.3d at 100; *Sussman v. Am. Broad. Cos., Inc.*, 186 F.3d 1200, 1201–03 (9th Cir. 1999)); *see Kurowski v. Rush Sys. for Health*, 683 F. Supp. 3d 836, 844 (N.D. Ill. 2023). But the parties dispute what is required to be an independent act.

In *Okash v. Essentia Health*, the court dismissed the ECPA and MPCA claims because the plaintiff failed to plausibly alleged facts suggesting that the interception of data was in furtherance of an independent criminal or tortious act. No. 23-CV-482 (JRT/LIB), 2025 WL 642913, at *2 (D. Minn. Feb. 27, 2025) (citing *Okash*, 2024 WL 1285779, at *7). After the plaintiff amended his complaint, the court again dismissed these claims because they did not allege that the data was "independently used in a crime or tort." *Id.* at *3. Noting that the plaintiff relied "solely on the public-facing portion of Essentia's website," the court concluded that "there was no obvious crime or tort sufficiently

[12] *Mehkail* noted that other courts apply the crime-tort exception "only where either the 'primary motivation' or 'determinative factor' in a party's interception was to commit a crime or tort," then found the complaint alleged an independent tort. 726 F. Supp. 3d at 927.

independent from the initial interception of data to trigger [ECPA] liability." *Id.* at *4. The court distinguished *Mehkail* and *Kurowski*, noting that those cases involved data collected from a patient portal. *Id.*

Plaintiffs contend that the Amended Complaint alleges the criminal and tortious purpose for TCO's interception of Plaintiff's PHI was "the separate and independent disclosure of that information" to third parties. (ECF No. 43 at 31 (citing Am. Compl. ¶ 180).) This is a theory plausibly pled—that TCO intercepted Lacey's and Nelson's PHI and then used the information to sell it, thus violating the wiretap statutes.

*Contemporaneousness.* To invoke the crime-tort exception, the defendant also must have intended to use the intercepted information to commit a criminal or tortious act "[a]t the time of the recording." *Caro*, 618 F.3d at 99. The Amended Complaint alleges that TCO violated its own privacy policies, intentionally violated the laws, and acted knowingly when it installed the tracking tools. (*See, e.g.*, Am. Compl. ¶¶ 15, 102, 178–85, 224.) The Court finds that Plaintiffs satisfy the contemporaneousness requirement for pleading purposes.

*Intent to harm victim*. Finally, the crime-tort exception requires that the defendant intercepted the plaintiff's communications "with an intent to use that interception against the non-consenting party in some harmful way." *Meredith v. Gavin*, 446 F.2d 794, 799 (8th Cir. 1971). The Amended Complaint alleges that TCO "intentionally and willfully incorporated the Pixel into its Website and encouraged patients to use the Website for

healthcare purposes, [TCO] had notice and knew that its practices would cause injury to Plaintiffs." (Am. Compl. ¶ 225.) This allegation is sufficient.

For these reasons, the Court declines to dismiss Counts I and II.

## V. Count III: Invasion of Privacy Through Intrusion upon Seclusion

A claim for invasion of privacy based on an intrusion upon seclusion must allege that a party "intentionally intrude[d], physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person." *Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 233 (Minn. 1998) (citation omitted). In *Group Health*, the complaint sufficiently alleged an intrusion when they alleged that the defendant "deliberately integrated" tracking tools into its website and servers, which shared the communications with third parties. 709 F. Supp. 3d at 714 (citations omitted). The complaint reasonably suggested an intrusion "highly offensive to a reasonable person" because it "describe[d] the interference as intentional and involving sensitive health information, including communications about medical records and diagnoses." *Id.*

Plaintiffs allege that TCO knowingly and willfully installed the tracking tools on its website, including its online appointment-request form, and disclosed the PHI to third parties. (Am. Compl. ¶¶ 11, 15, 92–45 (p. 33–42).) As to whether such an intrusion was "highly offensive to a reasonable person," Plaintiffs allege that TCO's appointment-request form discloses patient status—which is protected information under HIPAA—to

third parties. *See, e.g.*, *In re Grp. Health*, 709 F. Supp. 3d at 714. Accepting these allegations as true and drawing all reasonable inferences in Plaintiffs' favor, they have alleged a plausible intrusion-upon-seclusion claim. The motion to dismiss Count III is denied.

## VI. Count IV: Negligence

To prevail on a negligence claim under Minesota law, a plaintiff must show "(1) the existence of a duty of care, (2) a breach of that duty, (3) an injury, and (4) that the breach of the duty of care was a proximate cause of the injury." *DeLuna v. Mower Cnty.*, 936 F.3d 711, 716 (8th Cir. 2019) (citing *Domagala v. Rolland*, 805 N.W.2d 14, 22 (Minn. 2011)). TCO argues that Plaintiffs fail to allege the elements of duty and breach.

Plaintiffs assert that TCO breached its duty of care by disclosing a "health record" as defined under the MHRA, which includes information relating to the physical or mental health or condition of a patient, or the provision of health care to a patient. Minn. Stat. § 144.291, subdiv. 2(c). TCO does not dispute that it owes patients and prospective patients a duty to keep their PHI confidential. It argues that it "would have no way to know that anyone browsing [its] public facing website was in fact a patient." (ECF No. 38 at 30.) And this appears true, so far as it goes. But the Amended Complaint also alleges that patients and prospective patients use the website to schedule appointments, and that doing so caused their PHI to be disclosed to third parties. Users—like Lacey and Nelson—who allegedly completed TCO's appointment-request form that requires a "Patient Name," provide TCO with reason to know that the user is a patient or potential

patient. *See In re Grp. Health*, 709 F. Supp. 3d at 717 (concluding that plaintiffs sufficiently alleged a "breach in protecting private communications and health data"). The motion to dismiss Count IV is denied.

**VII. Count V: Breach of Implied Covenant**

A claim for breach of contract under Minnesota law requires: "(1) formation of a contract; (2) performance by plaintiff of any conditions precedent; (3) a material breach of the contract by defendant; and (4) damages." *Gen. Mills Operations, LLC v. Five Star Custom Foods, Ltd.*, 703 F.3d 1104, 1107 (8th Cir. 2013) (citation omitted). "An implied-in-fact contract is one inferred from the circumstances and conduct of the parties." *Tri-State Bobcat, Inc. v. FINN Corp.*, 338 F. Supp. 3d 971, 982 (D. Minn. 2018). TCO asserts that the Amended Complaint fails to allege the formation of a contract and damages.

As for contract formation, the parties dispute whether TCO's privacy policy created an implied contract. The Amended Complaint alleges that Plaintiffs and TCO had a "meeting of the minds" when Plaintiffs agreed to provide their PHI and PII to TCO and paid for healthcare in exchange for TCO providing healthcare services and protecting their PHI and PII. (Am. Compl. ¶ 254.) Plaintiffs upheld their end of the agreement by paying for healthcare services and providing their PHI and PII. (*Id.* ¶ 255.) TCO's policy promises that TCO "will not use or disclose your private medical information for marketing purposes, nor will i-Health sell your private medical information for

marketing purposes without your written consent."[13] (*Id.* ¶ 99 (p. 51)); *see Privacy Policy*, Twin Cities Orthopedics, https://tcomn.com/privacy-policy/ [https://perma.cc/7T8V-3QTE]. TCO allegedly breached this policy by disclosing Plaintiffs' PHI and PII without consent to third parties like Meta and Google. (Am. Compl. ¶¶ 256–57.) Plaintiffs plausibly allege that an implied contract was formed.

As for damages, the Amended Complaint alleges damages in the form of loss of the benefit of the bargain, continued and ongoing risk to their PHI and PII, and diminution in value of PHI and PII. (Am. Compl. ¶¶ 39, 61 (p. 44), 78 (p. 47), 258, 260.) It also alleges that Plaintiffs' personal, health, and financial information is valuable to third parties. (*Id.* ¶¶ 106–22.) These allegations are like those deemed sufficient in *Group Health*. There, the medical provider allegedly breached an implied contract—evidenced by the provider's privacy policies—by disclosing their private information to third parties. *In re Grp. Health*, 709 F. Supp. 3d at 714–15. The plaintiffs alleged that their private information had value, and that because of the breaches, they "sustained damages in the form of the loss of the benefit of their bargain and diminution in value of Private Information." *Id.*

---

[13] TCO argues that Plaintiffs fail to allege that the privacy policy was on its website when they visited it, or when or where the privacy policy was disclosed to them. (ECF No. 38 at 31–32.) The Amended Complaint quotes the privacy policy language and cites an internet archive webpage for "TCO's Privacy Policy in January 2021." (Am. Compl. at 51 n.45.) The Court draws reasonable inferences in Plaintiffs' favor and thus infers that the quoted policy was posted on TCO's website when Plaintiffs visited it. The lack of allegations about Plaintiffs' viewing the policy is not fatal to the claim. *See Doe v. Tenet Healthcare Corp.*, 731 F. Supp. 3d 142, 150 (D. Mass. 2024) (finding similar allegations sufficient to support an implied contract claim).

(quotation marks and citation omitted) (noting that "debates over the value of Plaintiffs' loss are fact disputes better left for summary judgment or trial").) The Court denies the motion to dismiss Count V.

### VIII. Count VI: Unjust Enrichment

To state an unjust enrichment claim, a plaintiff must allege "(1) a benefit conferred; (2) the defendant's appreciation and knowing acceptance of the benefit; and (3) the defendant's acceptance and retention of the benefit under such circumstances that it would be inequitable for him to retain it without paying for it." *Mekhail*, 726 F. Supp. 3d at 936–37 (citing *Christensen L. Off., PLLC v. Ngouambe*, No. A17-1917, 2018 WL 2293423, at *6 (Minn. Ct. App. May 21, 2018)). Plaintiffs allege that providing PHI and PII to TCO is a benefit they afforded TCO, which provided TCO "with economic, intangible, and other benefits, including substantial monetary compensation." (Am. Compl. ¶ 264.) TCO contends that this conclusory allegation fails to articulate (1) what PHI or PII was conferred or (2) what benefit TCO received.

As for the information conferred, the Court has concluded that the Amended Complaint alleges that Lacey and Nelson requested appointments using TCO's website. Doing so required them to confer some PHI (*e.g.*, their patient status) to TCO.

As for the benefit received, the Amended Complaint alleges the value of the data allegedly collected by the third parties. (*Id.* ¶¶ 106–22 (alleging value to third parties), 264–68; *see also id.* ¶ 70 (alleging savings on TCO's advertising and marketing costs).)

Plaintiffs sufficiently allege that TCO received a benefit by monetizing Plaintiffs' PHI and PII and "unjustly retained those benefits at [Plaintiffs'] expense," (*e.g.*, *id.* ¶ 265)—which the Court must take as true at this stage of the litigation. *See Okash*, 2024 WL 1285779, at *7 ("[T]he Court must take as true Okash's allegation that Essentia received monetary compensation for his data, even if the allegation lacks other specifics.").

TCO also argues that the bargain was not "unjust" because TCO's privacy policies only promise not to use or disclose "private medical information"; TCO did not promise that all activity on the website would be kept confidential. (Am. Compl. ¶ 99 (p. 51).) The Amended Complaint alleges that TCO's website, including its appointment-request page, contained tracking tools that allegedly disclosed Lacey's and Nelson's PHI to third parties. This is enough for now. The Court will not "explore the contours of the privacy policy at this stage. [TCO] may present its arguments concerning the equities of that policy with the benefit of a factual record developed in discovery." *Mekhail*, 726 F. Supp. 3d at 938 (denying motion to dismiss unjust enrichment claim based on similar allegations). The motion to dismiss Count VI is denied.

## IX. Count VII: Minnesota Uniform Deceptive Trade Practices Act

The Minnesota Uniform Deceptive Trade Practices Act ("MUDTPA") prohibits representing that goods or services have characteristics they do not have or that "goods or services are of a particular standard, quality, or grade . . . if they are of another." Minn. Stat. § 325D.44, subdiv. 1(5), (7). Under the MUDTPA, the "sole statutory remedy for

deceptive trade practices is injunctive relief." *Gardner v. First Am. Title Ins.*, 296 F. Supp. 2d 1011, 1020 (D. Minn. 2003) (citation omitted); *see* Minn. Stat. § 325D.45, subdiv. 1.

TCO asserts that Plaintiffs' allegations of deceptive practices and likelihood of future harm fail to satisfy the heightened pleading standard of Rule 9(b), which applies to MUDTPA claims. *See E-Shops Corp. v. U.S. Bank Nat. Ass'n*, 678 F.3d 659, 665 (8th Cir. 2012). Under Rule 9(b), Plaintiffs "must state with particularity the circumstances constituting fraud or mistake." Fed. Rule. Civ. P. 9(b).

*Allegations of deceptive practices*. To state a MUDTPA claim, Plaintiffs must plausibly allege that TCO's affirmative misrepresentations or material omissions could have "deceive[d] a reasonable consumer." *Song v. Champion Petfoods USA, Inc.*, No. 18-CV-3205 (PJS/KMM), 2020 WL 7624861, at *3 (D. Minn. Dec. 22, 2020), *aff'd*, 27 F.4th 1339 (8th Cir. 2022); (*see, e.g.*, Am. Compl. ¶ 278).

TCO argues that Plaintiffs do not plausibly allege that TCO shared their PHI with third parties, and thus "no reasonable consumer could be deceived by TCO's practices." (ECF No. 38 at 37.) But Plaintiffs provided sufficient allegations of TCO's disclosure of Lacey's and Nelson's PHI to third parties, notwithstanding TCO's representation that it will not use, disclose, or sell PHI for marketing purposes without written consent. (*See* Am. Compl. ¶ 99 (p. 51).) So, this argument fails. *See Okash*, 2024 WL 1285779, at *6 (denying motion to dismiss MUDTPA claim where plaintiff "identifies specific misrepresentations" in defendant's privacy policy).

*Irreparable injury or future harm.* TCO also contends that Plaintiffs fail to sufficiently allege future harm. The MUDTPA provides injunctive relief for "[a] person likely to be damaged by a deceptive trade practice." Minn. Stat. § 325D.45, subdiv. 1. To withstand a motion to dismiss, a MUDTPA claim "must allege an irreparable injury or threat of future harm." *Knotts v. Nissan N. Am., Inc.*, 346 F. Supp. 3d 1310, 1328 (D. Minn. 2018). TCO argues that Plaintiffs "are on notice of the allegedly deceptive practice and thus can no longer be deceived or harmed by continued violations." (ECF No. 38 at 36); *see Jaskulske v. State Farm Mut. Auto. Ins.*, No. 14-CV-869 PAM/TNL, 2014 WL 5530758, at *6 (D. Minn. Nov. 3, 2014) ("Having experienced, investigated, and alleged the settlement practice, Jaskulske is on notice of the practice and can no longer say that he will again be deceived by the practice.").

Plaintiffs allege that they "face ongoing harassment and embarrassment in the form of unwanted targeted advertisements" and request injunctive relief. (Am. Compl. ¶¶ 244, 293; *see also, e.g.*, *id.* ¶¶ 51 (p. 43), 61 (p. 44), 68 (p. 45), 78 (p. 47).) Other courts have found similar allegations were sufficient to allege future harm. *See In re Grp. Health*, 709 F. Supp. 3d at 721 (finding plaintiffs alleged future harms of "continued and ongoing risk of harassment, spam, and targeted advertisements"); *Okash*, 2024 WL 1285779, at *6 ("Injunctive relief may also help remedy ongoing harms from the already-collected data.").

Finally, TCO contends that the MUDTPA claim is moot because TCO updated its website to notify users of the existence of cookies and allows users to opt out of unnecessary cookies. But Plaintiffs allege a continuing harm: "ongoing harassment and embarrassment in the form of unwanted targeted advertisements." (Am. Compl. ¶ 244.) And TCO "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). TCO has not met this burden at this stage of the litigation. *See Okash*, 2025 WL 642913, at *5 ("Because [defendant] maintains its ability to use Pixel and could easily turn it back on at any point, the MUDTPA claim is not moot."); *cf. Kurowski*, 683 F. Supp. 3d at 847–48 (dismissing analogous deceptive-trade-practices-act claim because the complaint alleged that the third-party transmissions had ceased and ongoing disclosures "do not involve any protected IIHI"). The motion to dismiss Count VII is denied.

### X. Count IX: Minnesota Health Records Act

The Minnesota Health Records Act ("MHRA") provides that a healthcare provider may not release a patient's health records to a person without the patient's consent. Minn. Stat. § 144.293, subdiv. 2. The statute "imposes liability on a person who negligently or intentionally releases a health record in violation of MHRA guidelines." *Rhoades v. Lourey*, No. A18-1120, 2019 WL 1006804, at *2 (Minn. Ct. App. Mar. 4, 2019) (cleaned up, citations omitted).

TCO argues that Plaintiffs fail to plausibly allege that TCO disclosed protected health records to third parties. The MHRA defines "[h]ealth record" as "any information . . . that relates to the past, present, or future physical or mental health or condition of a patient; the provision of health care to a patient; or the past, present, or future payment for the provision of health care to a patient." Minn. Stat. § 144.291, subdiv. 2(c). A "health record" does not include a situation where a "person's status as a patient could be inferred." *Furlow v. Madonna Summit of Byron*, No. A19-0987, 2020 WL 413356, at *3 (Minn. Ct. App. Jan. 27, 2020) (citation omitted).

TCO argues that mere medical queries in a public website are not health records under the MHRA. But Lacey and Nelson allegedly requested appointments using TCO's website, which required them to confer their PHI (*i.e.*, their patient status) to TCO. Courts have held that patients who used a healthcare provider's website to communicate PHI including "schedul[ing] appointments and procedures," plausibly pled an MHRA claim. *In re Grp. Health*, 709 F. Supp. 3d at 713; *see Mekhail*, 726 F. Supp. 3d at 935–36 (declining to dismiss MHRA claim where the information allegedly disclosed revealed that the plaintiff was a patient and included the unauthorized disclosure of appointments); *cf. Okash*, 2025 WL 642913, at *6 (declining to dismiss MHRA claim where plaintiffs allegedly used the website to research specific doctors and medical conditions). The motion to dismiss Count IX is denied.

## CONCLUSION

Based on the above and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED:

1. Defendant's Motion to Dismiss (ECF No. 36) is GRANTED IN PART and DENIED IN PART, as set forth above;

2. Plaintiff Kelly Vriezen is DISMISSED as a party to this case; and

3. Plaintiffs are ORDERED to correct the complaint paragraph numbers in the Amended Complaint and file a sealed version and a redacted version of the corrected Amended Complaint within 21 days of the date of this Order.

Dated: September 30, 2025

BY THE COURT:

s/Nancy E. Brasel
Nancy E. Brasel
United States District Judge