**BARG SINGER HOESLY PC**
Cody Hoesly, OSB #052860
choesly@bargsinger.com
121 SW Morrison Street, Suite 600
Portland, OR 97204
Telephone: (503) 241-8521

**BURSOR & FISHER, P.A.**
Sarah N. Westcot (*pro hac vice* forthcoming)
Stephen A. Beck (*pro hac vice*)
701 Brickell Ave., Suite 2100
Miami, FL 33131
Tel: (305) 330-5512
Fax: (305) 676-9006
E-Mail: swestcot@bursor.com
sbeck@bursor.com

*Attorneys for Plaintiff and the Putative Class*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| B.N., individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Oregon Reproductive Medicine, LLC d/b/a ORM Fertility,<br><br>Defendant. | Case No. 3:25-cv-00202-IM<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>**(1) VIOLATION OF FEDERAL ELECTRONIC COMMUNICATIONS PRIVACY ACT (“ECPA”) 18 U.S.C. § 2511(1) *et seq.*;**<br><br>**(2) NEGLIGENCE;**<br><br>**(3) BREACH OF CONFIDENCE;**<br><br>**(4) UNJUST ENRICHMENT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff B.N. ("Plaintiff"), brings this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendant Oregon Reproductive Medicine, LLC d/b/a ORM Fertility ("Defendant" or "ORM"). Plaintiff brings this action based on personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all patients who accessed and used www.ormfertility.com (the "Website") to book a consultation for IVF, fertility, and/or other family planning services.

2. Patients trust healthcare providers to safeguard their information. Fertility treatment can be a difficult journey—both physically and emotionally. When booking consultation for fertility services online, patients reasonably expect the sensitive and legally protected information related to their appointment will remain confidential and protected from third parties. Defendant knows that its patients expect the intimate details of their treatment to remain confidential. Such an expectation is based, in part, on legal protections afforded to such information. Being able to trust that their health information is secure is essential to upholding patient rights and the integrity of our healthcare system.

3. Despite that promise, ORM aided, employed, agreed, and conspired with LinkedIn Corporation ("LinkedIn") to intercept sensitive and confidential communications sent and received by Plaintiff and Class Members, including communications related to their reproductive health.

4. Defendant aided in these unlawful disclosures without Plaintiff and Class Members' knowledge or consent.

5. Plaintiff brings this action on behalf of herself and the Class (as defined below) for equitable relief and to recover damages and restitution for: (i) violation of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1), *et seq.*; (ii) negligence; (iii) breach of confidence; and (iv) unjust enrichment.

6. As a result of Defendant's conduct, Plaintiff and Class Members have suffered numerous injuries, including but not necessarily limited to: (i) invasion of privacy; (ii) diminution of value of their PII and PHI; and (iii) statutory damages.

## PARTIES

7. Plaintiff is domiciled in Portland, Oregon. Plaintiff was in Oregon when she booked consultations for fertility services using Defendant's Website around May of 2022 and March of 2024. Due to the surreptitious nature of the disclosures at issue, Plaintiff was not aware that her confidential communications had been disclosed by Defendant until around November 2024. Without knowledge of the inner workings of LinkedIn's ad tech, there was no way for Plaintiff to know that her confidential medical communications had been disclosed by ORM.

8. Plaintiff first learned of Defendant ORM due to the proximity of one of its Portland-based clinics to her residence. Plaintiff did not conduct any online searches for fertility treatment or fertility clinics prior to or after booking her fertility appointment directly on Defendant's Website. Plaintiff attended her consultation and received services related to fertility treatment[1] from Defendant.

9. During the time Plaintiff used the Website, she maintained an active LinkedIn

---

[1] To prevent further disclosure of Plaintiff's confidential medical information, Plaintiff has not included in her allegations the precise nature of the treatment she received from ORM.

account. Plaintiff used the same device and browser to access the Website and her LinkedIn account. Subsequently, as a result of the conduct of Defendant, she received targeted advertisements on LinkedIn relating to fertility services. Again, without knowledge of how the LinkedIn Insight Tag operates or the ability to operate highly technical tools to view data transmissions, Plaintiff would have no way of knowing why she was receiving targeted advertisements, or that those advertisements were linked to her online medical bookings for fertility treatment. And because Plaintiff did not conduct any other online searches for fertility treatment, her information could not have been disclosed through other means.

10. Pursuant to the systemic process described herein, Defendant assisted third parties such as LinkedIn with intercepting Plaintiff's communications, including those that contained personally identifiable information ("PII") and protected health information ("PHI"). This includes information related to the specific fertility treatment she received with ORM. Defendant assisted LinkedIn's interceptions without Plaintiff's knowledge, consent, or express written authorization.

11. By failing to receive the requisite consent, Defendant breached its duty of confidentiality and aided LinkedIn in unlawfully intercepting Plaintiff's PII and PHI.

12. Such acts are an egregious violation of Plaintiff's right to privacy.

13. Defendant ORM is an Oregon based limited liability company with its principal place of business at 808 SW 15th Avenue, Portland, Oregon. Defendant owns and operates the website www.ormfertility.com. Defendant provides in-person fertility services and treatment at its two clinics located in Portland, Oregon. Defendant embedded a software code known as the LinkedIn Insight Tag on its Website, as described in more detail below. Defendant embedded this tracking technology on its Website for advertising purposes.

## JURISIDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq* ("ECPA")). This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. §1367. Further, this action is a putative class action, and Plaintiff alleges that at least one member of the Classes, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

15. This Court has personal jurisdiction over Defendant because Defendant resides in this District.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred within this District and both the Plaintiff and Defendant reside in this District.

## FACTUAL ALLEGATIONS

### A. Plaintiff's Communications with ORM Involved PHI

17. Plaintiff first became aware of the existence of ORM's fertility clinics due to the proximity of one of ORM's Portland-based clinics to her home. Plaintiff did not conduct any online searches regarding fertility treatment or for fertility clinics. Because she was aware of ORM and the proximity of one of their clinics to her home, she went directly to ORM's website.

18. Plaintiff scheduled an IVF consultation on ORM's website. To do so, she navigated through ORM's IVF-specific treatment page (ormfertility.com/ivf-in-vitro-fertilization/) and clicked the "Schedule Your Consult" button.

19. Plaintiff then accessed ORM's consultation booking form, where she entered her

first and last name, email address, phone number, date of birth, city, state, and zip code. All of this information was transmitted to LinkedIn, along with the fact that Plaintiff clicked on the "Schedule Your Consultation" button on the *IVF specific treatment page* – the page which brought her to the form field for booking her consultation.

20. These inputs constitute PHI because they identify the individual and relate to her future provision of fertility healthcare services, including specifically in-vitro fertilization. Critically, HIPAA includes in its definition of protected individually identifiable health information ("IIHI") any information received by a health care provider that relates to past, present, or future physical or mental health or condition. This information is protected even before a formal patient relationship is established.[2]

21. ORM received these communications directly from Plaintiff, and by embedding the LinkedIn Insight Tag, simultaneously transmitted the contents of these communications to LinkedIn.

22. Plaintiff's inputs on Defendant's consultation booking page go far beyond simply browsing a public-facing website. And relatedly, Defendant's disclosures go far beyond simply disclosing which public-facing websites Plaintiff visited.

23. Plaintiff's inputs on Defendant's consultation booking page also go far beyond a simple website search (for example, a search on ORM's website for in-vitro fertilization).

[2] The HIPPA E-Tool, a web-based software program designed to help healthcare organizations maintain compliance with HIPAA explains to medical providers on its website that "Protected Health Information ('PHI') is central to HIPAA but is widely misunderstood. Many people believe PHI includes a diagnosis or some kind of medical information but this is not true." HIPAA E-Tool goes on to explain that "any one piece of individually identifiable information connected to the provision of past, present or future health status" constitutes PHI, and that "it does not need to contain or reveal medical information. A simple reminder by text or email to a patient without any medical information contains PHI." *See https://thehipaaetool.com/protected-health-information-faqs/*

Plaintiff *did not simply search* a website for fertility treatment – she booked a medical consultation with a specific provider (ORM) after navigating to the booking page for a specific treatment (as evidenced by Defendant's transmission of Plaintiff's click on the "book a consultation button" while on the IVF webpage – thereby identifying the specific treatment for which she was booking an appointment).

### B. ORM's Use of the LinkedIn Insight Tag and Disclosure of Plaintiff's PHI and Contents of Her Electronic Communications

24. Put simply, the LinkedIn Insight Tag is a JavaScript tracking tool that monitors user action on a website and identifies users who have a LinkedIn account.

25. Unlike general internet advertising that might steam from a Google search, the Insight Tag operates through LinkedIn's own first party cookies (li_sugr, lms_ads) present on a user's browser because the user has a LinkedIn account.

26. When a user visits a website containing the Insight Tag:

a. The browser loads the site's content and simultaneously loads LinkedIn's code;

b. The Insight Tag reads LinkedIn's cookies, which contain identifiers linked to the user's LinkedIn profile;

c. The Tag records page views, button clicks, form interactions, and page titles;

d. The Tag automatically sends "events" to LinkedIn – e.g. "IVF page viewed," "consultation form viewed," "consultation form submitted," and associated metadata;

e. LinkedIn matches the cookie-based identifier to the user's LinkedIn account and adds the user to an advertising audience segment.

27. Thus, whether or not a user Googled fertility is irrelevant, as the LinkedIn Tag does not use Google search data. It uses only the LinkedIn cookie data and user website activity.

28. ORM configured the Insight Tag to track fertility consultation conversions, allowing LinkedIn to receive very clear information indicating that Plaintiff sought a consultation with their company for in-vitro fertilization.

29. As Plaintiff navigated the IVF page and interacted with the consultation form, the Insight Tag captured:

- The in-vitro fertilization URL path
- The in-vitro fertilization page title
- Plaintiff's click on "Schedule Your Consult Today"
- The consultation form URL
- The event "Form Submit" indicating that Plaintiff did in fact schedule her consultation appointment
- Form-field identifiers (name, email, date of birth, address fields)
- LinkedIn member-ID linked cookies

30. These data points constitute "contents" of Plaintiff's electronic communications under 18 U.S.C. § 2510(8).

31. These data points also constitute PHI because they identify Plaintiff and reveal that she sought fertility treatment, and specifically that she sought in-vitro fertilization with a particular medical provider – ORM. Disclosure of a specific doctor by name is not required to constitute PHI, as the disclosure of a HIPAA covered entity (like a clinic or practice) name in conjunction with patient information is sufficient.[3]

---

[3] U.S. Dept. of Health and Human Services, https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html#who (explaining that health care providers covered by HIPAA include all "providers of services," including institutional providers such as hospitals or large practices, as well as non-institutional providers such as individual physicians).

### C. Reproductive Health Information is Sensitive and Confidential

32. Defendant assisted LinkedIn with intercepting information that is sensitive, confidential, and personally identifiable.

33. Not only is this information sensitive and confidential, it is also legally protected by state and federal law.

34. Indeed, in enacting ORS 192.553, the Oregon State legislature articulated the state's policy to protect individuals protected health information, and more specifically "[t]he right to have protected health information of the individual safeguarded from unlawful use or disclosure." ORS 192.553(1)(a); *see generally* ORS 192.553 to 192.581.

35. Thus, Oregon law requires all fertility clinics, including ORM, to maintain information related to fertility treatment within their control as confidential.

36. Further, Oregon law expressly prohibits unlawful disclosure, such as Defendant's disclosure of sensitive health information to unauthorized third parties, including LinkedIn.

37. Federal law has similar requirements. Under HIPAA, a healthcare provider may not disclose PII or PHI without the patient's express written authorization.[4]

38. Indeed, the Oregon Legislature saw fit to acknowledge the additional protections HIPAA provides in ORS 192.553(2) which states:

> In addition to the rights and obligations expressed in ORS 192.553 to 192.581, ***the federal Health Insurance Portability and Accountability Act privacy regulations, 45 C.F.R. parts 160 and 164, establish additional rights and obligations regarding the use and disclosure of protected health information and the rights of individuals regarding the protected health information of the individual.***

ORS 192.553(2) (emphasis added).

39. The United States Department of Health and Human Services ("HHS") has

[4] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502, 165.508(a), 164.514(b)(2)(i).

established a national standard, known as the HIPAA Privacy Rule, to explain the duties healthcare providers owe to their patients. "The Rule requires appropriate safeguards to protect the privacy of [PHI] and sets limits and conditions on the uses and disclosures that may be made of such information without an individual's authorization."[5]

40. A healthcare provider violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-d9 ("Part C"): "(1) uses of causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual."[6]

41. The statute states that an entity "shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity . . . and the individual obtained or disclosed such information without authorization." *Id.*

42. The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant when it is knowingly disclosing individually identifiable health information relating to its patients.

43. Defendant further failed to comply with other HIPAA safeguard regulations as follows:

a. Failing to ensure the confidentiality and integrity of electronic PHI that ORM created, received, maintained and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

b. Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

---

[5] U.S. Dept. of Health and Human Services, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html

[6] 42 U.S.C. § 1320d-6.

c. Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to ORM in violation of 45 C.F.R. § 164.308(a)(6)(ii);

d. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 306(a)(2);

e. Failing to protect against reasonably anticipated uses of disclosures of electronic PHI not permitted under privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3); and

f. Failing to design, implement and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

44. Health care organizations regulated under HIPAA, like Defendant, may use third-party tracking tools, such as LinkedIn Insight Tag, *in a limited way* to perform analysis on data key to operations. They are not permitted, however, to use these tools in a way that may expose patients' PHI to vendors. As explained by a statement published by the HHS:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. **For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures**.[7]

[7] HHS.gov, USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES (THE "BULLETIN") (EMPHASIS ADDED), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

45. The Bulletin discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, **because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.**[8]

46. Plaintiff and Class Members face exactly the risks about which the government expresses concern. Defendant's unlawful conduct resulted in LinkedIn intercepting information regarding Plaintiff and Class Members scheduling consultations on the Website.

47. The Bulletin goes on to make clear how broad the government's view of protected information is. It explains:

> This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, **or any unique identifying code**.[9]

48. Crucially, that paragraph in the government's Bulletin continues:

> All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services. This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present,

[8] *Id.* (emphasis added).

[9] *Id.* (emphasis added).

or future health or health care or payment for care.[10]

49. Then, in July 2022, the Federal Trade Commission ("FTC") and the Department of Health and Human Services ("HHS") issued a joint press release warning regulated entities about the privacy and security risks arising from the use of online tracking technologies:

> The Federal Trade Commission and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) are cautioning hospitals and telehealth providers [regulated entities] about the privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps that may be impermissibly disclosing consumers' sensitive personal health data to third parties.
>
> "When consumers visit a hospital's [regulated entity's] website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties," said Samuel Levine, Director of the FTC's Bureau of Consumer Protection. "The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue doing everything in our powers to protect consumers' health information from potential misuse and exploitation."
>
> "Although online tracking technologies can be used for beneficial purposes, patients and others should not have to sacrifice the privacy of their health information when using a hospital's [regulated entity's] website," said Melanie Fontes Rainer, OCR Director. "OCR continues to be concerned about impermissible disclosures of health information to third parties and will use all of its resources to address this issue."
>
> The two agencies sent the joint letter to approximately 130 [regulated entities] hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies gather identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app.
>
> In their letter, both agencies reiterated the risks posed by the unauthorized disclosure of an individual's personal health information to third parties. For example, the disclosure of such information could reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, and where an individual seeks medical

[10] *Id.* (emphasis added).

treatment.[11]

50. Therefore, Defendant's conduct, as described more thoroughly below, is directly contrary to federal law and the clear pronouncements by the FTC and HHS.

**D. LinkedIn's Platform and Business Tools**

51. LinkedIn markets itself as "the world's largest professional network on the internet[.]"[12] But LinkedIn is no longer simply a tool to help users find jobs or expand their professional network. LinkedIn has moved into the marketing and advertising space and boasts of its ability to allow potential advertisers to "[r]each 1 billion+ professionals around the world" via its Marketing Solutions services.[13] Recently, LinkedIn was projected as being responsible for "roughly 0.9 percent of the global ad revenue" which included approximately $5.91 billion in advertising revenue in 2022.[14]

52. According to LinkedIn, "[t]argeting is a foundational element of running a successful advertising campaign — [g]etting your targeting right leads to higher engagement, and ultimately, higher conversion rates." [15] Targeting refers to ensuring that advertisements are targeted to, and appear in front of, the target demographic for an advertisement. To that end,

---

[11] Federal Trade Commission, *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, July 20, 2023, https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking.

[12] LINKEDIN, WHAT IS LINKEDIN AND HOW CAN I USE IT?, https://www.linkedin.com/help/linkedin/answer/a548441#.

[13] LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions.

[14] Valentina Dencheva, *LinkedIn annual ad revenue 2017-2027*, STATISTA (Dec. 12, 2023), https://www.statista.com/statistics/275933/linkedins-advertising-revenue.

[15] LINKEDIN, REACH YOUR AUDIENCE: TARGETING ON LINKEDIN, p.3, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/resources/pdfs/linkedin-targeting-playbook-v3.pdf.

LinkedIn's Marketing Solutions services allow potential advertisers to "[b]uild strategic campaigns" targeting specific users.[16] LinkedIn's "marketing solutions allow advertisers to select specific characteristics to help them reach their ideal audience. The ads [users] see on LinkedIn are then targeted to provide content relevant to [the users]."[17]

53. As a result of its activities and operation of the LinkedIn Insight Tag, LinkedIn is able to make extremely personal inferences about individuals' demographics, intent, behavior, engagement, interests, buying decisions, and more.[18]

54. The personal information and communications obtained by LinkedIn are used to fuel various services offered via LinkedIn's Marketing Solutions including Ad Targeting, Matched Audiences, Audience Expansion, and LinkedIn Audience Network.[19]

55. Such information is extremely valuable to marketers and advertisers because the inferences derived from users' personal information and communications allows marketers and advertisers, including healthcare providers and insurance companies, to target potential customers.[20]

---

[16] LINKEDIN, *supra* note 11.

[17] LINKEDIN, LINKEDIN ADS AND MARKETING SOLUTIONS, https://www.linkedin.com/help/lms/answer/a421454.

[18] *See* LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions/audience ("Target audiences through demographic marketing[,]" "Zero in on intent, behavior, engagement, interests, and more[,]" and "Reach the LinkedIn audience involved in the buying decision").

[19] *See id.*

[20] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy ("We serve you tailored ads both on and off our Services. We offer you choices regarding personalized ads, but you cannot opt-out of seeing other ads."); LINKEDIN, ACCOUNT TARGETING, https://business.linkedin.com/marketing-solutions/ad-targeting ("Target your ideal customer based on traits like their job title, company name or industry, and by professional or personal interests"); LINKEDIN, EXAMPLES OF TRENDING AND BEST-IN-CLASS HEALTHCARE CAMPAIGNS AND CONTENT, p.6, https://business.linkedin.com/content/dam/me/business/en-us/marketing-

56. For example, through the use of LinkedIn's Audience Network, marketers and advertisers are able to expand their reach and advertise on sites other than LinkedIn to "reach millions of professionals across multiple touchpoints."[21] According to Broc Munro of Microsoft, "[w]e gravitate towards social platforms like LinkedIn to achieve more targeted marketing engagement. However, we know that our audiences don't spend all their time on social media. LinkedIn Audience Network enables us to expand our reach to trusted sites while still respecting our audience targeting. This increases the impact of our advertising."[22]

57. In July 2022, "LinkedIn Marketing Solutions surpassed $5 billion in annual revenue[.]"[23] That figure is "expected to further grow to reach 10.35 billion U.S. dollars by 2027."[24]

58. According to LinkedIn, the LinkedIn Insight Tag is "[a] simple code snippet added to [a] website [that] can help you optimize your campaigns, retarget your website visitors, and learn more about your audiences."[25] LinkedIn represents that the LinkedIn Insight Tag

---

solutions/healthcare-microsite/resources/lkin-lms-sales-healthcare-campaigns-trending-content-Jan2023.pdf ("BD zeroed in on the end-benefit with a 30 second video introducing their PIVO needle-free blood collection device to potential customers."); LINKEDIN, HEALTHCARE SOCIAL MEDIA STRATEGIES FOR 2023, p.1, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/healthcare-microsite/resources/hc-social-media-trends.pdf (listing "potential customers" as "Common audiences" for insurance sector).

[21] LINKEDIN, ACCOUNT TARGETING, https://business.linkedin.com/marketing-solutions/ad-targeting.

[22] LINKEDIN, LINKEDIN AUDIENCE NETWORK, https://business.linkedin.com/marketing-solutions/native-advertising/linkedin-audience-network.

[23] *LinkedIn Business Highlights from Microsoft's FY22 Q4 Earnings*, LINKEDIN PRESSROOM (July 25, 2022), https://news.linkedin.com/2022/july/linkedin-business-highlights-from-microsoft-s-fy22-q4earnings#:~:text=And%20LinkedIn%20Marketing%20Solutions%20surpassed,revenue%20for%20the%20first%20time.

[24] Dencheva, *supra* note 12.

[25] LINKEDIN, INSIGHT TAG, https://business.linkedin.com/marketing-solutions/insight-tag.

"enable[s] in-depth campaign reporting and unlock[s] valuable insights about your website visitors."[26]

59. LinkedIn's current iteration of its Insight Tag is a JavaScript-based code which allows for the installation of its software.[27] A critical feature allows the LinkedIn Insight Tag to track users, even when third-party cookies are blocked.[28] LinkedIn "recommend[s] using the JavaScript-based Insight Tag or Conversions API" because third-party cookie settings are being deprecated across the industry.[29] Embedding the JavaScript as a first-party cookie causes users' browsers to treat the LinkedIn Insight Tag as though it is offered by the website being visited, rather than by LinkedIn. Doing so ensures that the third-party cookie-blocking functions of modern web browsers do not prevent LinkedIn from collecting data through its software.[30] Instead, the LinkedIn Insight Tag is shielded with the same privacy exemptions offered to first-party cookies.

60. When a user who has signed in to LinkedIn (even if the user subsequently logs out) is browsing a website where the LinkedIn Insight Tag has been embedded, an HTTP request is sent using cookies, which includes information about the user's actions on the website.

61. These cookies also include data that differentiate users from one another and can be used to link the data collected to the user's LinkedIn profile.

---

[26] LINKEDIN, LINKEDIN INSIGHT TAG FAQS, https://www.linkedin.com/help/lms/answer/a427660.

[27] LINKEDIN, *supra* note 23.

[28] *Id.* ("It's important for advertisers to prepare for these changes by switching to JavaScript tags and enabling 'enhanced conversion tracking' in the Insight Tag settings to continue capturing signals where 3rd party cookies are blocked.").

[29] *See id.*

[30] *See id.*

62. The HTTP request about an individual who has previously signed into LinkedIn includes requests from the "li_sugr" and "lms_ads" cookies. Each of these cookies are used by LinkedIn "to identify LinkedIn Members off LinkedIn" for advertising purposes.[31]

63. For example, the "li_sugr" cookie is "[u]sed to make a probabilistic match of a user's identity."[32] Similarly, the "lms_ads" cookie is "[u]sed to identify LinkedIn Members off LinkedIn for advertising."[33]

64. A LinkedIn profile contains information including an individual's first and last name, place of work, contact information, and other personal details. Based on information it obtains through the LinkedIn Insight Tag, Defendant LinkedIn is able to target its account holders for advertising.

65. LinkedIn never receives consent from users to intercept and collect electronic communications containing their sensitive and unlawfully disclosed information. In fact, LinkedIn expressly warrants the opposite.

66. When first signing up, a user agrees to the User Agreement.[34] By using or continuing to use LinkedIn's Services, users agree to two additional agreements: the Privacy Policy[35] and the Cookie Policy.[36]

67. LinkedIn's Privacy Policy begins by stating that "LinkedIn's mission is to connect the world's professionals . . . . Central to this mission is our commitment to be

---

[31] LINKEDIN, LINKEDIN COOKIE TABLE, https://www.linkedin.com/legal/l/cookie-table.

[32] *See id.*

[33] *See id.*

[34] LINKEDIN, USER AGREEMENT, https://www.linkedin.com/legal/user-agreement.

[35] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy.

[36] LINKEDIN, COOKIE POLICY, https://www.linkedin.com/legal/cookie-policy.

transparent about the data we collect about you, how it is used and with whom it is shared."[37]

68. The Privacy Policy goes on to describe what data LinkedIn collects from various sources, including cookies and similar technologies.[38] LinkedIn states "we use cookies and similar technologies (e.g., pixels and ad tags) to collect data (e.g., device IDs) to recognize you and your device(s) on, off and across different services and devices where you have engaged with our Services. We also allow some others to use cookies as described in our Cookie Policy."[39]

69. However, LinkedIn offers an express representation: "**We will only collect and process personal data about you where we have lawful bases.**"[40]

70. Despite this explicit representation, LinkedIn intentionally intercepts and receives sensitive and unlawfully disclosed information in violation of state and federal privacy laws.

71. Defendant assisted LinkedIn in these unlawful interceptions.

72. Users never choose to provide sensitive information to LinkedIn because, among other reasons, they never know whether a particular website uses the LinkedIn Insight Tag, and, if so, what sensitive personal data it collects.

73. At all relevant times, Defendant installed the LinkedIn Insight Tag on its Website for targeted advertising purposes.

**E. How LinkedIn Intercepted Plaintiff's and Class Members' Protected Health Information**

74. ORM is a provider of various family planning and fertility services that

---

[37] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy.

[38] *Id.*

[39] *Id.*

[40] *Id.* (emphasis added).

encourages patients to book consultations at its brick-and-mortar locations through its Website.

75. Unbeknownst to patients, LinkedIn was tracking their activity the moment they entered the ORM Website.

76. For example, the LinkedIn Insight Tag was embedded on the Website, which allowed LinkedIn to intercept and record "click" events. Click events detail information about which page on the Website the patient was viewing as well as the selections they were making. LinkedIn intercepts information including which procedure the patient was viewing (e.g., IVF), whether they clicked to schedule a consult, and whether they submitted the consultation form. *See* Figures 1–3.




**Figure 1:** Screenshot of ORM Website with LinkedIn Insight Tag interceptions overlayed (confirmable with developer tools)




**Figure 2:** Screenshot of ORM Website with LinkedIn Insight Tag interceptions overlayed (confirmable with developer tools)




**Figure 3:** Screenshot of ORM Website with LinkedIn Insight Tag interceptions overlayed (confirmable with developer tools)

77. Through the LinkedIn Insight Tag, Defendant assisted LinkedIn in intercepting its patients' confidential information related to their fertility-related medical appointments. Both Defendant and LinkedIn monetized this data for targeted advertising purposes.

78. As shown in Figures 1 through 3, Defendant assisted LinkedIn in intercepting several pieces of confidential information, including the procedure and whether a consultation was booked.

79. These interceptions also included the li_sugr and lms_ads cookies, which LinkedIn utilizes to identify its account holders for targeted advertising.

80. LinkedIn incorporated the information it intercepted from the ORM Website into its marketing tools to fuel its targeted advertising service.

81. Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant or LinkedIn to intercept her confidential health information.

82. By law, Plaintiff is entitled to privacy in her protected health information and confidential communications. Defendant deprived Plaintiff of her privacy rights when it implemented a system that surreptitiously tracked and recorded Plaintiff's and other patients' confidential communications, personally identifiable information, and protected health information.

83. Figures 1 through 3 alone are evidence of LinkedIn's interception of the data, and therefore no inference needs to be drawn as to the link between Plaintiff's disclosed information and the targeted advertisements she ultimately received on LinkedIn. These figures alone show with certainty that LinkedIn was receiving Plaintiff's PHI as alleged herein.

84. Plaintiff's IVF-specific targeted advertisements on LinkedIn could not have been generated from any Google search activity or general internet browsing because LinkedIn's

advertising system does not ingest, receive, or target users based on Google Search queries or searches conducted on external websites. LinkedIn's ad-targeting engine relies *exclusively* on information it receives through LinkedIn's own first-party tracking technologies—primarily the LinkedIn Insight Tag and LinkedIn's associated cookies (li_sugr, lms_ads). The Insight Tag functions by matching website activity to a user's LinkedIn member ID, allowing LinkedIn to track a user's actions only on websites where the Insight Tag is installed.

85. Here, ORM had installed the Insight Tag specifically on the IVF consultation pathway, including the "IVF – In Vitro Fertilization" page and the consultation form. As a result, LinkedIn received Plaintiff's IVF-specific page views, her "Schedule Your Consult" click, and her form-interaction metadata tied to her LinkedIn member ID. Because LinkedIn does not target ads using Google Search data, and because Plaintiff did not enter IVF-related queries elsewhere online, the only source capable of producing the IVF-specific LinkedIn ads Plaintiff received was the data transmitted to LinkedIn directly through the Insight Tag embedded on ORM's website. Thus, the IVF-specific ads Plaintiff received on LinkedIn are uniquely consistent with, and can only be explained by ORM's unlawful disclosure of Plaintiff's fertility-related communications and PHI to LinkedIn.

**D. Plaintiff's and Class Members' Private Information Had Financial Value**

86. Plaintiff's PII and PHI has economic value. LinkedIn regularly uses the data that it intercepts to create its Matched Audience, Audience Expansion, and LinkedIn Audience Network, which it then sells to its advertising clients. Companies, like Google, have recognized the value of user data and have even instituted a pilot program in which it pays users $3/week to track them online.

87. Data harvesting is one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, internet companies earned $202 per American user from mining and selling data. That figure continues to grow, as estimates for 2022 were as high as $434 per user, for a total of more than $200 billion industry wide.

88. The value of health data in particular is well-known and has been reported on extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry," in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[41]

89. Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[42]

90. Indeed, numerous marketing services and consultants offering advice to companies on how to build their email and mobile phone lists—including those seeking to take advantage of targeted marketing—direct putative advertisers to offer consumers something of value in exchange for their personal information. "No one is giving away their email address for free. Be prepared to offer a book, guide, webinar, course or something else valuable."[43]

91. There is also a market for data in which consumers can participate. Personal information has been recognized by courts as extremely valuable. *See In re Marriott Int'l, Inc.,*

---

[41] https://time.com/4588104/medical-data-industry/

[42] https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-foryour-health-data.html

[43] VERO, HOW TO COLLECT EMAILS ADDRESSES ON TWITTER https://www.getvero.com/resources/twitter-lead-generation-cards/.

*Customer Data Sec. Breach Litig.*, 440 F.Supp.3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

92. Several companies, including Google, Neilsen, and HoneyGain, have products though which they pay consumers for a license to track their data.

93. Facebook also has paid users for their digital information, including browsing history. Until 2019, Facebook ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages of 13 and 35.

94. Additionally, healthcare data is extremely valuable to bad actors. For example, health care records may be valued at up to $250 per record on the black market.[44]

**CLASS ACTION ALLEGATIONS**

95. Plaintiff seeks to represent a class defined as all persons in the United States who, during the class period, had a LinkedIn account and booked a consultation on www.ormfertility.com (the "Class").

96. Plaintiff also seeks to represent a subclass of individuals defined as all persons in Oregon who, during the class period, had a LinkedIn account and booked a consultation on www.ormfertility.com (the "Oregon Subclass") (together with the Class, the "Classes").

97. Subject to additional information obtained through further investigation and

[44] Tori Taylor, Hackers, Breaches, and the Value of Healthcare Data, SecureLink (June 30, 2021), https://www.securelink.com/blog/healthcare-data-new-prize-hackers.

discovery, the foregoing definition of the Classes may be expanded or narrowed by amendment to the complaint or narrowed at class certification.

98. The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement.

99. Specifically excluded from the Classes are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

100. **Numerosity.** The members of the proposed Classes are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable. Upon information and belief, Plaintiff reasonably estimates that there are thousands of individuals that are members of the proposed Classes. Although the precise number of proposed members are unknown to Plaintiff, the true number of members of the Classes are known by Defendant. Members of the Classes may be notified of the pendency of this action by mail and/or publication through the records of Defendant and third-party LinkedIn.

101. **Typicality.** The claims of the representative Plaintiff are typical of the claims of the Classes in that the representative Plaintiff, like all members of the Classes, scheduled a consultation on Defendant's Website for fertility treatment. The representative Plaintiff, like all members of the Classes, has been damaged by Defendant's misconduct in the very same way as the members of the Classes through the privacy violations alleged herein. Further, the factual

bases of Defendant's misconduct are common to all members of the Classes and represent a common thread of misconduct resulting in injury to all members of the Classes.

102. **Existence and predominance of common questions of law and fact.** Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individual members of the Classes. These common legal and factual questions include, but are not limited to, the following:

a. Whether Defendant intentionally tapped the lines of internet communication between patients and their fertility healthcare provider;

b. Whether Defendant's Website surreptitiously recorded personally identifiable information, protected health information, and related communications and subsequently, or simultaneously, disclosed that information to LinkedIn;

c. Whether LinkedIn is a third-party eavesdropper;

d. Whether Defendant's disclosures of personally identifiable information, protected health information, and related communications constituted an affirmative act of communication;

e. Whether Defendant's conduct, which allowed LinkedIn—an unauthorized person—to view Plaintiff's and Class Members' personally identifiable information and protected health information, resulted in a breach of confidentiality;

f. Whether Defendant violated Plaintiff's and Class Members' privacy rights by using the LinkedIn Insight Tag to record and communicate patients' confidential medical communications; and

g. Whether Defendant breached its duty owed to Plaintiff and the Classes by

disclosing their PII and PHI to LinkedIn.

103. **Adequacy of Representation.** Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff has retained counsel who are highly experienced in complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Classes. Plaintiff has no interests that are antagonistic to those of the Classes.

104. **Superiority.** A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by members of the Classes are relatively small compared to the burden and expense of individual litigation of her claims against Defendant. It would, thus, be virtually impossible for members of the Classes, on an individual basis, to obtain effective redress for the wrongs committed against them. Furthermore, even if members of the Classes could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

105. In the alternative, the Classes may be certified because:

(a) the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual members of the Classes that would establish incompatible standards of conduct for the Defendant;

(b) the prosecution of separate actions by individual members of the Classes would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Classes not parties to the adjudications, or substantially impair or impede her ability to protect her interests;

and/or

(c) Defendant has acted or refused to act on grounds generally applicable to the Classes as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Classes as a whole.

## CAUSES OF ACTION

### COUNT I
### Violation of the Electronic Communications Privacy Act
### 18 U.S.C. § 2511(1), *et seq.*

106. Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

107. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

108. The ECPA protects both sending and receipt of communications.

109. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

110. The transmission of Plaintiff's PII and PHI to Defendant's Website qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

111. The transmission of PII and PHI between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

112. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

113. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

114. The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5).

115. The following instruments constitute "devices" within the meaning of the ECPA:

h. The computer codes and programs LinkedIn used to track Plaintiff's and Class Members' communications while they were navigating the Website;

i. Plaintiff's and Class Members' browsers;

j. Plaintiff's and Class Members' mobile devices;

k. Defendant's and LinkedIn's web and ad servers;

l. The plan Defendant and LinkedIn carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website.

116. Plaintiff's and Class Members' interactions with Defendant's Website are electronic communications under the ECPA.

117. By utilizing and embedding the LinkedIn Insight Tag on its Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. §

2511(1)(a).

118. Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications through the LinkedIn Insight Tag, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and PHI to third parties, such as LinkedIn.

119. Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding PII and PHI, including their LinkedIn Account Identifier and the fertility procedure they booked an appointment for. This confidential information was then monetized for targeted advertising purposes.

120. By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

121. By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

122. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, among others.

123. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that

intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, as alleged above, Defendant violated a provision of the Health Insurance Portability and Accountability Act, specifically 42 U.S.C. § 1320d-6(a)(3). This provision imposes a criminal penalty for knowingly disclosing individually identifiable health information ("IIHI") to a third party. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.[45]

124. Plaintiff's information that Defendant disclosed to LinkedIn qualifies as IIHI, and Defendant violated Plaintiff's and Class Members' expectations of privacy. Such conduct constitutes tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d-6. Defendant used the wire or electronic communications to increase its profit margins. Defendant specifically used the LinkedIn Insight Tag to track and utilize Plaintiff's and Class Members' PII and PHI for financial gain.

125. Defendant was not acting under the color of law to intercept Plaintiff's and Class Members' wire or electronic communications.

126. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy through the LinkedIn Insight Tag. Plaintiff and Class Members, all of whom are patients of Defendant, had a reasonable expectation that Defendant would not redirect their communications to

---

[45] 42 U.S.C. § 1320d-6.

LinkedIn without their knowledge or consent.

127. The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq.*

128. As a result of each and every violation thereof, on behalf of herself and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510, *et seq.* under 18 U.S.C. § 2520.

**COUNT II**
**Negligence**

129. Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein and brings this claim individually and on behalf of the proposed Classes.

130. Defendant knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' PII and PHI, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, misused, and disclosed to unauthorized parties.

131. As a provider of health care under the law, Defendant had a special relationship with Plaintiff and Class Members who entrusted Defendant to adequately protect their PII and PHI.

132. Defendant knew that the PII and PHI at issue was private and confidential and should be protected as private and confidential, as evidenced by the Privacy Pledge made to its patients. Thus, Defendant owed a duty of care not to subject Plaintiff and Class Members to an unreasonable risk of unauthorized disclosure.

133. Defendant knew, or should have known, of the risks inherent in collecting and storing PII and PHI and allowing it to be accessed by unauthorized third parties.

134. Defendant's failure to take proper security measures to protect Plaintiff's and Class Members' PII and PHI created conditions conducive to a foreseeable risk of unauthorized access and disclosure of such confidential information to unauthorized third parties. As described above, Plaintiff and Class Members are part of a foreseeable, discernable group that was at high risk of having their confidential information compromised, and otherwise wrongly disclosed if not adequately protected by Defendant.

135. Defendant had a duty under common law to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiff's and Class Members' PII and PHI.

136. Defendant owed a duty to timely and adequately inform Plaintiff and Class Members, in the event of their PII and PHI being improperly disclosed to unauthorized third parties.

137. Defendant systematically failed to provide adequate security for data in its possession or over which it had supervision and control.

138. Defendant, through its actions and omissions, unlawfully breached duties to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' PII and PHI within Defendant's possession, supervision, and control.

139. Defendant, through its actions and omissions, unlawfully breached duties owed to Plaintiff and Class Members by failing to have appropriate procedures in place to prevent dissemination of Plaintiff's and Class Members' PII and PHI.

140. Defendant, through its actions and omissions, unlawfully breached duties to timely and fully disclose to Plaintiff and Class Members that the PII and PHI within Defendant's

possession, supervision, and control was improperly accessed by unauthorized third parties, the nature of this access, and precisely the type of information improperly accessed.

141. Defendant's breach of duties owed to Plaintiff and Class Members proximately caused Plaintiff's and Class Members' PII and PHI to be compromised by being accessed by unauthorized third parties.

142. As a result of Defendant's ongoing failure to adequately notify Plaintiff and Class Members regarding what type of PII and PHI has been compromised, Plaintiff and Class Members are unable to take the necessary precautions to mitigate damages.

143. As a proximate result of Defendant's negligence and breach of duties as set forth above, Defendant's breaches of duty caused Plaintiff and Class Members to, inter alia, have their data shared with third parties without their authorization or consent, receive unwanted advertisements that reveal seeking treatment for specific medical conditions, fear, anxiety and worry about the status of their PII and PHI, diminution in the value of their personal data for which there is a tangible value, and/or a loss of control over their PII and PHI, all of which can constitute actionable actual damages.

144. In failing to secure Plaintiff's and Class Members' PII and PHI, Defendant is guilty of oppression, fraud, or malice. Defendant acted or failed to act with a reckless, willful, or conscious disregard of Plaintiff's and Class Members' rights. Plaintiff, in addition to seeking actual damages, also seeks punitive damages on behalf of herself and the Classes.

145. Defendant's conduct in violation of applicable laws directly and proximately caused the unauthorized access and disclosure of Plaintiff's and Class Members' PII and PHI, and as a result, Plaintiff and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct. Plaintiff and Class Members seek actual, compensatory, and

punitive damages, and all other relief they may be entitled to as a proximate result of Defendant's negligence.

**COUNT III**
**Breach of Confidence**

146. Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein and brings this claim individually and on behalf of the proposed Classes.

147. Medical providers have a duty to their patients to keep non-public medical information completely confidential, and to safeguard sensitive personal and medical information. This duty arises from the implied covenant of trust and confidence that is inherent in the physician-patient relationship.

148. Medical providers also have a duty to maintain the confidentiality of Plaintiff's PII and PHI under HIPAA and its implementing regulations, as well as Oregon state law governing PHI.

149. Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website.

150. In light of the special relationship between Defendant and Plaintiff and Class Members, whereby Defendant became a guardian of Plaintiff's and Class Members' PII and PHI, Defendant became a fiduciary by its undertaking and guardianship of the PII and PHI, to act primarily for the benefit of its patients, including Plaintiff and Class Members: (1) for the safeguarding of Plaintiff's and Class Members' PII and PHI; (2) to timely notify Plaintiff and Class Members of disclosure of their PII and PHI to unauthorized third parties; and (3) to maintain complete and accurate records of what patient information (and where) Defendant did

and does store and disclose.

151. Contrary to its duties as a medical provider and its express and implied promises of confidentiality, Defendant installed the LinkedIn Insight Tag to disclose and transmit to third parties Plaintiff's and Class Members' communications with Defendant as well as the contents of those communications, including PII and PHI.

152. These disclosures were made for commercial purposes without Plaintiff's or Class Members' knowledge, consent, or authorization, and were unprivileged.

153. The unauthorized disclosures of Plaintiff's and Class Members' PII and PHI were intentionally caused by Defendant's employees acting within the scope of their employment. Alternatively, the disclosure of Plaintiff's and Class Members' PII and PHI occurred because Defendant's negligent hiring or supervision of its employees or agents, its failure to establish adequate policies and procedures to safeguard the confidentiality of patient information, or its failure to train its employees or agents to properly discharge their duties under those policies and procedures.

154. The third-party recipients included, but may not be limited to, LinkedIn. Such information was received by this third party in a manner that allowed it to identify Plaintiff and the individual Class Members.

155. Defendant's breach of the common law implied covenant of trust and confidence is further evidenced by its failure to comply with federal and state privacy regulations, including:

a. By failing to ensure the confidentiality and integrity of electronic PHI Defendant created, received, maintained, and transmitted, in violation of 45 C.F.R. §164.306(a)(1);

b. By failing to protect against any reasonably anticipated uses or disclosures

of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

c. By failing to ensure compliance with the HIPAA security standard rules by its workforce in violation of 45 C.F.R. § 164.306(a)(4);

d. By failing to obtain satisfactory assurances, including in writing, that its business associates and/or subcontractors would appropriately safeguard Plaintiff's and Class Members PHI;

e. By failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f. By failing to implement technical security measures to guard against unauthorized access to electronic PHI that is being transmitted over an electronic communications network in violation of 45 C.F.R. § 164.312(e)(1);

g. By impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons in violation of 45 C.F.R. § 164.502, *et seq.*;

h. By failing to effectively train all members of its workforce (including independent contractors) on the policies and procedures with respect to PHI as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of PHI in violation of 45

C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5);

i. By failing to keep PII and PHI confidential as required by ORS 192.553, *et seq*.; and

j. By otherwise failing to safeguard Plaintiff's and Class Members' PII and PHI.

156. The harm arising from a breach of provider-patient confidentiality includes mental suffering due to the exposure of PII and PHI and erosion of the essential confidential relationship between the healthcare provider and the patient.

157. As a direct and proximate cause of Defendant's unauthorized disclosures of PII and PHI, Plaintiff and Class Members were damaged by Defendant's breach in that:

a. Sensitive and confidential information that Plaintiff and Class members intended to remain private is no longer private;

b. Plaintiff and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

c. Defendant eroded the essential confidential nature of the provider-patient relationship;

d. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

e. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

f. Defendant's actions diminished the value of Plaintiff's and Class

Members' PII and PHI; and

g. Defendant's actions violated the property rights Plaintiff and Class Members have in their PII and PHI.

158. As a result, Plaintiff and Class Members have suffered and will continue to suffer damages due to Defendant's conduct. Plaintiff and Class Members seek general damages for invasion of their rights in an amount to be determined by a jury and nominal damages for each independent violation.

**COUNT IV**
**Unjust Enrichment**

159. Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein and brings this claim individually and on behalf of the proposed Classes.

160. Defendant benefits from the use of Plaintiff's and Class Members' PII and PHI and unjustly retained those benefits at their expense.

161. Plaintiff and Class Members conferred a benefit upon Defendant in the form of PII and PHI that Defendant collected from Plaintiff and Class Members, without authorization and proper compensation to exceed the limited authorization and access to that information which was given to Defendant.

162. Defendant exceeded any authorization given and instead consciously disclosed and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

163. Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members.

164. The benefits that Defendant derived from Plaintiff and Class Members was not offered by Plaintiff and Class Members gratuitously and rightly belongs to Plaintiff and Class Members. It would be against equity and good conscience for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

165. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of the alleged Classes, that the Court enter judgment in her favor and against Defendant as follows:

(a) For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as the representative for the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the Classes;

(b) For an order declaring that Defendant's conduct violates the causes of action referenced herein;

(c) For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d) For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For an order of restitution and all other forms of equitable monetary relief;

(g) For injunctive relief as pleaded or as the Court may deem proper; and

(h) For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: December 3, 2025

Respectfully Submitted,

By: */s/ Cody Hoesly*

**BARG SINGER HOESLY PC**
Cody Hoesly, OSB #052860
choesly@bargsinger.com
121 SW Morrison Street, Suite 600
Portland, OR 97204
Telephone: (503) 241-8521

**BURSOR & FISHER, P.A.**
Sarah N. Westcot (*pro hac vice* forthcoming)
Stephen A. Beck (*pro hac vice*)
701 Brickell Avenue, Suite 2100
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: swestcot@bursor.com
sbeck@bursor.com

*Attorneys for Plaintiff*